*Monarch Academy Baltimore Campus, Inc., et al. v. Baltimore City Board of School Commissioners*, No. 7, September Term, 2017.  Opinion by Getty, J.

**CIVIL PROCEDURE – APPEALABILITY OF A STAY ORDER – Maryland Code, Courts & Judicial Proceedings Article § 12-301**

This is a case involving charter schools. The operators of charter schools ("Charter School Operators") in Baltimore City filed a breach of contract claim in the Circuit Court for Baltimore City against the Baltimore City Board of School Commissioners. The circuit court entered an order staying ("Stay Order") the breach of contract action, and Charter School Operators appealed.  The Court of Appeals determined that the Stay Order suspended all claims before the circuit court and failed to specify what conditions the Charter School Operators must complete in order for their breach of contract claims to resume before the circuit court.  Under these limited circumstances, the Court of Appeals held that the Stay Order effectively put the operators of charter schools out of court and was an appealable final judgment.

**APPEAL – ABUSE OF DISCRETION**

The Stay Order was an appealable final judgment because there was no indication that the circuit court judge reviewed or considered either the prior proceedings or the prior decision of another circuit court judge and because the Stay Order was devoid of necessary detail, the circuit court judge abused his discretion in issuing the Stay Order.

**ADMINISTATIVE LAW – PRIMARY JURISDICTION**

Under the doctrine of primary jurisdiction, a court must determine whether an issue or issues in a case must first be resolved by an agency "which, under a regulatory scheme, have been placed within the special competence of an administrative body[.]" *Arroyo v. Bd. of Educ. of Howard Cty.*, 381 Md. 646, 658 (2004) (quoting *United States v. Western Pacific R.R. Co.*, 352 U.S. 59, 63-64 (1956)).  The Court of Appeals determined that a central issue underlying the Charter School Operators' breach of contract claims was whether they had received "an amount of county, State, and federal money for elementary, middle, and secondary students that is commensurate with the amount disbursed to other public schools in the local jurisdiction[,]" as mandated in Maryland Code, Education Article § 9-109.  And, the Court of Appeals held that because the State Board of Education ("State Board") has not provided a formal rule or regulation interpreting the charter school "commensurate" funding requirement suitable for application by courts, disputes involving charter school commensurate funding generally remain within the special competence of the State Board.  Therefore, the Court of Appeals concluded that the State Board had primary jurisdiction over the commensurate funding issues underlying Charter School Operators' breach of contract action, and that on remand the circuit court would be within its discretion to enter a more definite order staying proceedings to permit the parties to obtain a ruling from the State Board as to the commensurate funding issues in dispute.

Circuit Court for Baltimore City
Case No. 24-C-15-005507
Argued: September 11, 2017

IN THE COURT OF APPEALS
OF MARYLAND

No. 7

September Term, 2017

_____

MONARCH ACADEMY BALTIMORE
CAMPUS, INC., ET AL.

v.

BALTIMORE CITY BOARD OF SCHOOL
COMMISSIONERS

_____

Barbera, C.J.
Greene,
Adkins,
McDonald,
Watts,
Hotten,
Getty,

JJ.

_____

Opinion by Getty, J.
Greene, Watts and Hotten, JJ., concur and
dissent.

_____

Filed: December 18, 2017

This Court has twice addressed appeals in which public charter schools alleged that a local school board failed to meet the requirement in Maryland Code, Education Article ("ED") § 9-109 to provide the charter schools with funding that is "commensurate with the amount disbursed to other public schools in the local jurisdiction." *See Frederick Classical Charter Sch., Inc. v. Frederick Cty. Bd. of Educ.*, 454 Md. 330 (2017), *reconsideration denied* (Aug. 24, 2017); *Balt. City Bd. of Sch. Comm'rs v. City Neighbors Charter Sch.*, 400 Md. 324 (2007). However, in both of those cases, charter schools initially challenged a local school board's proposed annual funding allocation in an administrative adjudicatory proceeding before the State Board of Education ("the State Board"), and the dispute came before the courts only when one of the parties subsequently filed a petition for judicial review of the State Board's decision.

In contrast, the Petitioners in the instant case, thirteen operators of charter schools in Baltimore City (the "Charter School Operators"),[1] sought to obtain relief in a similar commensurate funding dispute by filing breach of contract complaints against the Respondent, the Baltimore City Board of School Commissioners (the "City Board"), directly in the Circuit Court for Baltimore City without first seeking review before the State

---

[1] Petitioners are the following Baltimore City charter school operators: Afya Baltimore, Inc., Baltimore International Academy Inc., Baltimore Montessori, Inc., City Neighbors Charter School, Inc., City Neighbors Hamilton, Inc., City Neighbors High School, Inc., Creative City Public Charter School Foundation, Inc., Empowerment Center, Inc., Experiential Environmental Education, Inc., Kipp Baltimore, Inc., Patterson Park Public Charter School, Inc., Southwest Baltimore Charter School, Inc., and Monarch Academy Baltimore Campus, Inc. Some operators run a single charter school in Baltimore City, while others operate more than one charter school.

Board.  The contracts at issue all contained a provision in which the City Board agreed to "allocate Commensurate Funding to the [Charter] School Operator," and to provide information as to its own finances and how it had reached a specific per-pupil commensurate funding figure for the charter school.  The Charter School Operators contended that the City Board breached those contractual requirements by not providing information as to its finances and commensurate funding calculations and by failing to provide the correct amount of commensurate funding for the 2015-16 school year.

After the cases were consolidated before the circuit court, the City Board moved to dismiss the case or stay the proceedings on the grounds that the State Board had primary jurisdiction over commensurate funding determinations.  After holding a hearing, Judge Julie Rubin concluded that the State Board had "provided sufficient guidance" regarding the meaning of commensurate funding so that the circuit court was "no longer obliged to punt the issue to the expertise of the administrative body."  Therefore, she declined to invoke the primary jurisdiction doctrine and denied the motion to dismiss.

On the same day as it filed its motion to dismiss before the circuit court, the City Board filed a petition for declaratory relief before the State Board, requesting that the State Board declare that its funding formula complies with ED § 9-109 and has resulted in commensurate funding.  After Judge Rubin's order, the State Board dismissed the petition, noting that the circuit court had "asserted its jurisdiction."  Thereafter, the City Board filed a counterclaim against the Charter School Operators before the circuit court.  The Charter School Operators moved to dismiss the counterclaim, and a hearing on their motion to dismiss was scheduled before the circuit court.  At that hearing, Judge Alfred Nance

2

questioned counsel as to the procedural background of the case, instructing them to "[t]ell me what happened that causes you to rightfully be in my courtroom." After a brief recess and off-the-record discussion in chambers, counsel for the City Board made an oral motion to dismiss the Charter School Operators' complaints. Judge Nance, after hearing arguments for and against the motion, determined that "in lieu of" granting the motion he would issue an order staying proceedings in the circuit court "pending administrative review of the parties' dispute by the State Board of Education."

After the Stay Order ruling, the parties moved to proceed on separate procedural tracks. The Charter School Operators appealed from the circuit court's Stay Order to the Court of Special Appeals, while the City Board once again filed a petition for declaratory relief before the State Board. The State Board once again dismissed the City Board's petition, stating that "the case remain[ed] within the jurisdictional purview of the courts." Subsequently, in a reported opinion, the Court of Special Appeals dismissed the Charter School Operators' appeal after concluding that the circuit court's Stay Order was not an appealable order. *Monarch Acad. Balt. Campus, Inc. v. Balt. City Bd. of Sch. Commissioners*, 231 Md. App. 594, 619 (2017). The Charter School Operators filed a petition for writ of certiorari from that dismissal, which we granted on April 4, 2017. *Monarch Acad. Balt. Campus v. Balt. City Bd. of Sch. Comm'rs.*, 452 Md. 523 (2017).

On appeal to this Court, the Charter School Operators contend that the circuit court's Stay Order was a final and appealable judgment, and therefore urge us to hold that the Court of Special Appeals erred in dismissing the appeal. The Charter School Operators

3

further assert that the State Board does not have primary jurisdiction over their breach of contract claims, and therefore the circuit court erred in entering the Stay Order.

When a court determines that a party's claim is within the authority of an administrative agency under the doctrine of primary jurisdiction, it is ordinarily entirely appropriate under the primary jurisdiction doctrine to enter a stay to permit that party to bring his or her claim before the appropriate agency. Then, after the agency has had the opportunity to evaluate and rule on the claim, a party may ordinarily seek judicial review before the circuit court. In this appeal, however, we are confronted with a rare and unique set of circumstances in which there is a strong likelihood that the Charter School Operators would not be able to obtain an administrative ruling on their breach of contract claim.

Here, the State Board is the only agency to which the Charter School Operators can bring their claim at the juncture at which the Stay Order was entered, and they can only do so in the form of a petition for declaratory relief. However, the agency has twice denied petitions for declaratory relief in this case, citing in the first denial the lack of any factual record upon which it could review and issue a declaratory judgment. Despite the arguments raised by the City Board in this appeal, there is no guarantee that the State Board would grant a third petition for declaratory relief under the circumstances present here. The State Board's prior declaratory rulings and this Court's precedent set forth a detailed and highly fact specific inquiry for charter school funding disputes. Of great significance to our decision, the contract between parties **requires** certain financial information to be disclosed by the City Board to the Charter School Operators. However, the Charter School Operators allege that they did not receive that information. If true, the Charter School

4

Operators simply may not have enough information to successfully frame a declaratory petition to the State Board, or to obtain a declaratory order from the State Board that fully resolves the charter school funding issues raised in their Complaint. And, although there is the potential for a limited discovery process before the State Board, it is discretionary and even if employed may not be sufficient to address this concern.

Finally, the Stay Order was entered in a rushed and improper manner, before there was any opportunity for discovery as to the information necessary for the resolution of the charter school funding claims, and without clear guidance to the State Board as to exactly what issues needed to be resolved before the matter could resume before the circuit court. Thus, the rushed and non-specific Stay Order at issue here further exacerbated the difficulties facing the Charter School Operators in pursuing an administrative remedy and eventually being able to return to court for a judicial resolution of their claim.

Therefore, under the above-described unique circumstances of this case, we shall hold that the Stay Order was a final and appealable judgment and therefore shall reverse the judgment of the Court of Special Appeals dismissing the appeal. We shall also hold that the circuit court abused its discretion in staying the proceeding in order for the parties to seek administrative review because the court did not first allow for discovery and did not provide guidance as to how and when the case would resume in circuit court. However, we shall also hold that the State Board retains primary jurisdiction as to the underlying commensurate funding issues in dispute and that, after discovery before the circuit court is concluded, it will be appropriate for the circuit court to enter a more definite order staying proceedings for review of those issues before the State Board.

**BACKGROUND**

### A. *Primary Jurisdiction*

The doctrine of primary jurisdiction derives from "the relationship between legislatively created administrative remedies and alternative statutory, common law or equitable judicial remedies." *Prince George's Cty. v. Ray's Used Cars*, 398 Md. 632, 644 (2007). We have explained the relationship between those remedies as follows:

> [W]henever the [General Assembly] provides an administrative and judicial review remedy to resolve a particular matter or matters, the relationship between that administrative remedy and a possible alternative judicial remedy will ordinarily fall into one of three categories:
>
> > [T]he administrative remedy may be *exclusive*, thus precluding any resort to an alternative remedy. Under this scenario, there simply is no alternative cause of action for matters covered by the statutory administrative remedy.
> >
> > [T]he administrative remedy may be *primary* but not exclusive. In this situation, a claimant must invoke and exhaust the administrative remedy, and seek judicial review of an adverse administrative decision, before a court can properly adjudicate the merits of the alternative judicial remedy.
> >
> > [T]he administrative remedy and the alternative judicial remedy may be fully *concurrent*, with neither remedy being primary, and the plaintiff at his or her option may pursue the judicial remedy without the necessity of invoking and exhausting the administrative remedy.

*United Ins. Co. of Am. v. Maryland Ins. Admin.*, 450 Md. 1, 14-15 (2016) (quoting *Ray's Used Cars*, 398 Md. at 644 (quoting *Zappone v. Liberty Life Ins. Co.*, 349 Md. 45, 60-61 (1998))) (emphasis in original) (footnote omitted).

When a party's claim(s) could properly be brought before either a court or an administrative agency, the agency remedy will generally be deemed primary "whenever

6

enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body[.]" *Arroyo v. Bd. of Educ. of Howard Cty.*, 381 Md. 646, 658 (2004) (quoting *United States v. Western Pacific R.R. Co.*, 352 U.S. 59, 63-64 (1956)). This Court has held that "[n]o fixed formula exists for applying the doctrine of primary jurisdiction[,]" and that "[i]n every case the question is whether the reasons for the existence of the doctrine are present and whether the purposes it serves will be aided by its application in the particular litigation." *Id.* at 658-59 (quoting *Western Pacific R.R. Co.*, 352 U.S. at 63-64). However, the Court has recognized that "[i]n the absence of specific statutory language indicating the type of administrative remedy, there is a rebuttable presumption that an administrative remedy was intended to be primary." *United Ins.*, 450 Md. at 15 (citing *Zappone*, 349 Md. at 63).

Of significance to this appeal, even when a court ultimately determines that one or more claims filed before it are properly within the primary jurisdiction of an administrative agency, that does not mean that the circuit court is divested of jurisdiction over the claim(s), or necessitates the dismissal of the action before the court. Instead, the doctrine only applies to preclude the court from adjudicating the claim(s) "until a final administrative *determination is made*." *Arroyo*, 381 Md. at 660 (emphasis in original). Thus, the appropriate action for a trial court in such an instance is generally not to dismiss the claim(s), but rather to "stay further proceedings regarding the judicial complaint" until the party can obtain a final administrative determination as to the issue in dispute. *Carter v. Huntington Title & Escrow, LLC*, 420 Md. 605 (2011); *see also Maryland Reclamation Assocs., Inc. v. Harford Cty., Maryland*, 382 Md. 348, 367 (2004).

7

## B. *Authority of the State Board of Education*

The General Assembly has vested the State Board of Education with expansive authority to interpret the provisions of the Education Article. Pursuant to ED § 2-205, the State Board has the authority to: "[d]etermine the elementary and secondary educational policies of this State," ED § 2-205(b); "[a]dopt bylaws, rules, and regulations for the administration of the public schools" which "have the force of law when adopted and published," ED § 2-205(c); "explain the true intent and meaning" of the Education Article and its own regulations and "decide all controversies and disputes" regarding those provisions, ED § 2-205(e); and, "exercise general control and supervision over the public schools and educational interests of this State," ED § 2-205(g).

We have explained that the State Board's authority under section 2-205 "constitutes a visitatorial power of such comprehensive character as to invest the State Board with the last word on any matter concerning education policy or the administration of the system of public education." *Frederick Classical*, 454 Md. at 370 (quoting *City Neighbors*, 400 Md. at 342-43). We have held that the State Board's visitatorial power "is not unlimited," and it is the courts that ultimately must decide purely legal questions. *Id.* at 371 (quoting *City Neighbors*, 400 Md. at 343). But, "'the broad statutory mandate given to [the State Board] requires that special deference be given to its interpretation of statutes that it administers,' . . . over and above that generally afforded to other administrative agencies[.]" *Id.* at 370 (quoting *City Neighbors*, 400 Md. at 343).

## C. *Administrative Remedies Before the State Board*

8

At the local level, the twenty-three Maryland counties and Baltimore City each have a school board that has oversight and control of education matters in its jurisdiction. Each local school system also has a superintendent—or, in Baltimore City, a Chief Executive Officer—who is the administrator of that system and is responsible for enforcing the rules and policies of both the local school board and the State Board, and for implementing State law. *See* ED §§ 4-101, 4-102, 4-108. A county superintendent's decision may be appealed to a local school board within thirty days. ED § 4-205(3). And, if a party is dissatisfied with the local school board's decision, that party may appeal to the State Board within thirty days from the decision of the local school board. *Id.*; *see also* Md. Code Regs. ("COMAR") 13A.01.05.02(A)-(C) (describing the required contents of an appeal to the State Board, and a deadline to file the appeal "within 30 calendar days of the decision of the local board").

However, and of great significance to the present dispute, there is also another process through which parties may ask the State Board to resolve a dispute as to the meaning and proper application of State educational law or State Board rules, regulations, or policies. If there is an "existing case or controversy" between an aggrieved party and a local school board, either party—the aggrieved party **or** the local school board—may **at any time** file "a petition for declaratory ruling by the State Board on the interpretation of a public school law or regulation of the State Board that is material to [that] existing case or controversy." COMAR 13A.01.05.02(D).

### D. Charter Schools and Commensurate Funding

Charter schools are a statutorily created alternative to traditional public schools that are "in the nature of semi-autonomous public schools," operating "under a contract with a State or local school board." *City Neighbors*, 400 Md. at 328. "The contract, or charter [agreement], defines how the school will be structured, staffed, managed, and funded, what programs will be offered, and how the school will operate and account for its activities." *Id.* In Maryland, charter schools are governed by the Maryland Public Charter School Program ("Charter School Program"), ED §§ 9-101 *et seq.*, which "sets forth a process for establishing new charter schools as well as monitoring, oversight, and accountability standards for charter schools once they are established." *Frederick Classical*, 454 Md. at 344. The purpose of the Charter School Program is to "establish an alternative means within the existing public school system in order to provide innovative learning opportunities and creative educational approaches to improve the education of students." ED § 9-101(b).

Charter schools operate under the supervision of the local school board of the county or local jurisdiction in which they are located. *See* ED § 9-103 (stating that local school boards are the "public chartering authority" for the granting of a charter agreement); ED § 9-102(11) (mandating that charter schools operate "under the supervision of the public chartering authority from which its charter is granted and in accordance with its charter" and, with limited exceptions, "the provisions of law and regulation governing other public schools"). Charter schools also receive funding from their local school board. ED § 9-109 provides a mandate for public funding of public charter schools:

> A county board shall disburse to a public charter school an amount of county, State, and federal money for elementary, middle, and secondary students **that is commensurate with the amount disbursed to other public schools in the local jurisdiction.**

(Emphasis added.) As we noted in *Frederick Classical*, "[t]he statutory interpretation of [ED § 9-109] and deciphering the meaning of 'commensurate' in this context has required extensive administrative deliberations" by the State Board. 454 Md. at 345.

### a. *City Neighbors Declaratory Rulings*

In 2005, the State Board issued a set of three declaratory rulings, which constituted its first definitive statements interpreting the meaning of ED § 9-109 and the commensurate funding requirement. We have previously referred to these rulings, which ultimately came before this Court in our decision in *City Neighbors*, as the "*City Neighbors* declaratory rulings." *See Frederick Classical*, 454 Md. at 346.

In the *City Neighbors* declaratory rulings, the State Board set forth a detailed, multi-step formula for calculating a charter school's per-pupil funding that the State Board would deem to be "commensurate" with funding provided to other public school students:

> The State Board concluded that ED § 9-109(a) "expressed a legislative intent that a charter school 'receive federal, State, and local funding in an amount proportionate to the amount of funds expended for elementary, middle, and secondary level students in the other public schools in the same system.'" [*City Neighbors*, 400 Md. at 336.] Furthermore, the State Board determined that the calculation of commensurate funds must include "'funding for services for which students in the public charter schools are eligible such as free and reduced price meals, pre-kindergarten, special education, English-language learners, Perkins, Title I, and transportation.'"[2]

---

[2] "Perkins" refers to the Federal Carl D. Perkins Vocational Education Act. See 20 U.S.C. §§ 2301 *et seq.* "Title I" refers to Title I of the Federal Elementary and Secondary Education Act of 1965, as amended from time to time. See 20 U.S.C. §§ 6301 *et seq.*

11

[*Id.*]  The Board further specified that the commensurate funding was to be calculated by starting with the local school system's total annual operating budget that includes all federal, State, and local funding,[3] and dividing by enrollment for the previous year[4] to reach an average per-pupil figure, overall and for each major category of spending.  *Id.* at 336-37.  Then, after deducting two percent for central office administrative costs, the State Board directed that local boards multiply the average per-pupil figure "by the student enrollment of the charter school to determine the total funding amount for the charter school."  *Id.* at 337.

The State Board determined that "[b]ecause the total school system operating budget encompassed all funds," including funds for specific services, "the average per[-]pupil amount derived from [the total operating budget] figure would be sufficient for the charter school to deliver the services for which its students were eligible."  *Id.*  The State Board noted, however, that charter schools "would have to make budgetary allocations in light of the students' eligibility requirements" under federal or state law "and in doing so must comply with all applicable Federal and State requirements."  *Id.*  "For the special services that must be provided to eligible students," the State Board determined that "[a] charter school could elect either to provide the services directly or have them provided by the school system, but if it opted for the latter, it would be required to reimburse the school system for the proportionate cost of those services."  *Id.* at 337-38.  A charter school would also need to reimburse the local school board "'for salary, local retirement, and other fringe benefit costs for the public school employees working in the charter school as well as for regular services and supplies that the charter school requests the local school system to provide.'"  *Id.* at 338.

*Frederick Classical*, 454 Md. at 347-48 (footnotes in original) (bracketed text added).

---

[3] The State Board noted that for the purposes of this calculation, "the total annual school system operating budget amount shall exclude appropriations for debt service and for adult education[.]"  *City Neighbors Charter School v. Balt. City Bd. of Sch. Comm'rs*, MSBE Op. No. 05-17 (May 26, 2005), at 4 n.2.

[4] The State Board explained that in calculating the per-pupil allocation, school systems "shall use the approved school system annual operating budget for the year in which the charter school application is filed."  *City Neighbors Charter Sch. v. Balt. City Bd. of Sch. Comm'rs*, MSBE Op. No. 05-17 (May 26, 2005), at 4 n.3.  However, because the enrollment count for each school year is not finalized until November, "the school system enrollment count for the previous school year shall be used for the calculation."  *Id.*

Of significance to this appeal, the State Board also stated that the detailed formula it had set forth "should be used as 'guidance and direction' to [ ] other charter school applicants and local school systems 'for the refinement of their working relationships on behalf of the public school children throughout this State.'" *Id.* at 349 (quoting *City Neighbors*, 400 Md. at 339).

### b. *This Court's City Neighbors Opinion*

Several local school boards, including the City Board, took issue with the State Board's formula and filed petitions for judicial review of the State Board's decision. Those petitions ultimately came before this Court on appeal in *City Neighbors*, 400 Md. 324 (2007).

We began our analysis in *City Neighbors* by considering the local school boards' claim that the declaratory rulings were in effect a binding "regulation" and must be deemed invalid because they were not issued in conformance with the requirements of Maryland Code, State Government Article ("SG") § 10-101 *et seq*. for formal rulemaking through regulations. 400 Md. at 344. We rejected that claim, noting that declaratory rulings are generally treated by courts "more in the nature of contested case adjudications than the adoption of a regulation." *Id.* at 345. And, we held that declaratory rulings as "a permissible mechanism by which [the State Board] may exercise its statutory authority to 'explain the true intent and meaning' of the public school laws and decide 'controversies and disputes' under those laws." *Id.* at 346. We therefore concluded that the State Board "was well within its discretion to proceed in the manner it did—adjudicating the cases

13

before it and offering 'guidance' to other applicants, rather than proceeding with more formal and binding regulations." *Id.*

Turning to the principal question of whether the State Board "had properly construed and applied ED § 9-109(a)," we concluded that the statute was "patently ambiguous." *Id.* at 346-47. We reviewed the statute's legislative history and concluded that the General Assembly had clearly intended "that the determination of commensurate funding would necessarily be on a per[-]pupil basis." *Id.* at 355. However, we also determined that the General Assembly had not specified "what was commensurate and how [ ] the amount disbursed to other public schools [was] to be determined," and that it "must have envisioned" that the State Board, "the body [the General Assembly] has consistently vested with the ultimate administrative authority to interpret, explain, and apply the public education laws," would interpret the meaning of those terms. *Id.*

Finally, we addressed the city and county boards' specific complaints about the State Board's formula: "the requirement that the funding be disbursed in cash, rather than in services, inclusion of Title I and special education expenses, and the limitation of the deduction for administration expenses to 2% in the calculation of commensurate funding." *Id.* at 356. We found no legal error in any of those claims. Noting that the statute calls for the disbursement of "money," the Court concluded that while charter schools may "negotiate for the provision of services" such services "cannot be forced on the charter schools at the whim of the county boards." *Id.* The Court also held that the State Board was "clearly entitled" to conclude that "commensurate" funding to charter schools must include funding for Title I and special education funds "to the extent that students in the

14

charter school are eligible for those services." *Id.* And the Court held that with respect to the 2% cap in central administrative costs, the State Board reasonably determined that "charter schools, being somewhat autonomous, would not need and should not be subject to the full range of control exercised by the central administration over the regular public schools, and that they therefore should not be charged with a share of that total expense." *Id.* at 356-57.

### c. *Frederick Classical*

In *Frederick Classical*, our most recent case to examine charter school funding, the Frederick County Board of Education withheld transportation funding from the calculation of its annual per-pupil commensurate funding allocation to Frederick Classical, a charter school, because the school did not provide transportation services to its students. 454 Md. at 341. Frederick Classical contested the withholding of the transportation funds before the local school board and, when it summarily refused to amend the allocation, appealed to the State Board. *Id.* The State Board held that, as a matter of law, "a charter school is not automatically entitled to funds for services it does not provide." *Id.* at 363. It therefore concluded that the local school board's withholding of transportation funds from Frederick Classical's per-pupil allocation "was not contrary to state law" and was "consistent with [its] past rulings."[5] *Id.*

---

[5] In the alternative, the State Board also decided that the charter school was not entitled to transportation funds because of language in its charter agreement with the local board.

15

This Court, however, reversed the decision of the State Board. We determined that the State Board's ruling was contrary to its own precedent in the *City Neighbors* declaratory rulings. We held that under the formula set forth in those rulings a local school board calculating a charter school's annual per-pupil allocation "generally must include in that calculation funds budgeted for any of the services expressly identified in the declaratory rulings—including funds for transportation services." *Id.* at 392. Although local school boards are not required to include in the calculation "funds for services that have detailed eligibility requirements under state and federal law when the charter school does not meet those eligibility requirements," we established that "there are no such eligibility requirements" for transportation services for the general student population.[6] *Id.*

Consequently, we concluded that, under the *City Neighbors* declaratory rulings formula, "a local school board must [] include the funds budgeted for [transportation] when calculating a charter school's per-pupil allocation, regardless of whether a charter school provides transportation services to its general student population." *Id.* As the State Board had incorrectly ruled that withholding transportation funding when Frederick Classical did not provide transportation services was "consistent with [its] prior rulings," when in fact it was not, we held that its ruling was an abuse of discretion. *Id.* at 405-406.

We then considered whether, on remand, the State Board was required to adhere to its own *City Neighbors* declaratory formula for calculating a charter school's

_____

[6] Under ED § 8-410, certain qualifying special education students must receive transportation services.

16

commensurate funding, or if it had the discretion to modify that formula. *Id.* at 406. We recognized that administrative agencies are generally accorded "ample latitude to adapt their rules and policies to the demands of changing circumstances," and may generally proceed either through adjudications or through more formal notice-and-comment rulemaking. *Id.* at 406-07 (quoting *Montgomery Cty. v. Anastasi*, 77 Md. App. 126, 137 (1988)). However, we also determined that courts have imposed some limits on agency discretion to change policies or rules, and highlighted two of those limits. First, if the policy that is being changed is "a policy of general application, embodied in or represented by a rule" then "the change must be accomplished by rulemaking." *Id.* at 408 (quoting *CBS Inc. v. Comptroller of the Treasury*, 319 Md. 687, 696 (1990)). Second, an agency's discretion may be circumscribed "when there is substantial reliance on the agency's settled standard or interpretation and a change would have a detrimental impact." *Id.* at 409.

We concluded that the first limitation that an existing rule may only be changed through new rulemaking did not apply because the guidance set forth in the *City Neighbors* declaratory rulings was not a formal "rule of widespread application." *Id.* However, we also noted that over a decade had passed since the State Board issued the *City Neighbors* declaratory rulings, but that the State Board "has never adopted a formal rule or regulation of general application interpreting the 'commensurate' funding requirement of ED § 9-109." *Id.* at 410. Accordingly, we concluded that "charter schools and their staff and student population have substantial reliance interests in the current State Board approach to determine a commensurate allocation of funds to their charter school in the *City Neighbors* declaratory rulings." *Id.* at 411. In light of those reliance interests, we held that

17

"if the State Board proceeds through an adjudicatory approach, it must offer a rational explanation for such a change in its written decision." *Id.* at 412. "That rational explanation," we emphasized, "must include how its new interpretation or approach is in keeping with the plain language and, where ambiguous, the legislative history and statutory purpose of ED § 9-109 and the Charter Schools Program statute as a whole, and account for the substantial reliance interests of charter school operators, staff and students, prospective charter school applicants, and local school boards." *Id.*

We therefore remanded the case to the State Board "to render a decision as to the claims raised by Frederick Classical consistent with our holdings . . . ." *Id.* at 422. And, we specifically stated that if the State Board determined "that Frederick Classical is entitled to additional funds" then the State Board "shall issue an order calculating the exact amount of additional funds owed based upon Frederick Classical's enrollment during the relevant years, and directing the [local school board] to pay that amount." *Id.*

### E. Facts and Procedural History of the Instant Appeal

#### a. The Charter School Operators Complaints

In the fall of 2015, the Charter School Operators filed individual breach of contract complaints against the City Board in the Baltimore City Circuit Court. The complaints, which raised "substantively similar" breach of contract claims stemming from charter agreement contracts entered into between each charter school and the City Board, were subsequently consolidated by the circuit court.[7]

---

[7] Judge Rubin originally ordered that the proceedings in the consolidated cases be captioned as *The Monarch Academy Baltimore Campus, Inc. v. Baltimore City Board of*

In the complaints, the Charter School Operators alleged that they entered into similar contracts with the City Board to operate one or more charter schools in Baltimore City (collectively, the "Contract"). The complaints quoted a provision of the contract regarding funding of the Charter Schools and financial transparency in the funding process, and provided annotations for terms defined elsewhere in the Contract. Including relevant annotations, the provision as quoted in the complaints reads as follows:

> 6.1 OPERATING FUNDS. The parties agree that Title 9[8] requires funding of the charter school that is commensurate with the amount disbursed to other public schools in the local jurisdiction, and that Commensurate Funding[9] is integral to this contractual relationship and essential to the School Operator's ability to operate the School hereunder and that all funds provided by the [City Board] to the school are to be used solely for the benefit of the school and its students. Accordingly, during each school year during the Term, **the School Board shall allocate Commensurate Funding to the School Operator** for the following school year pursuant to Applicable

---

*School Commissioners*, Case No. 24-C-16-000320. This order was later stricken and a subsequent order was issued to title the proceedings in the consolidated cases as *Baltimore International Academy Inc. v. Baltimore City Board of School Commissioners*, Case No. 24-C-15-005507. For this case, we will utilize the titling found in the Court of Special Appeals case.

On appeal to this Court, the Charter Schools have submitted one representative complaint, filed by Afya Baltimore, Inc. against the City Board, which they assert is "substantially similar" to the other consolidated complaints. The record also contains a second complaint, filed by Petitioners City Neighbors Charter School, Inc., City Neighbors Hamilton, Inc., and City Neighbors High School, Inc.

[8] "Title 9" is defined as "the Public Charter School Act of 2003, Title 9 of the Education Article of the Maryland Annotated Code ('Maryland Public Charter School Program'), and any regulations promulgated hereunder (as now and hereafter in effect, and as may be amended or modified . . . ."

[9] "Commensurate Funding" is defined as "a per pupil funding level consistent with and generally equivalent to the average level of resources provided to similar students across the School System."

19

Requirements.[10]  Any financial commitment on the part of the [Baltimore City] School System contained in this Agreement is subject to the annual appropriation by the [City Board].  The [City Board's] staff shall deliver to the School Operator a draft of the funding formula including the amount of the estimated per pupil allocation for the applicable school year (determined in accordance with the [City Board's] "approved funding formula" and Applicable Requirements) and will make a good faith effort to deliver these materials in no less than two weeks prior to the budget (distinct from the Budget of the School Operator covered in Section 6.2) submission deadline for the School, such deadline to be consistent with the deadline for all School System schools.  The draft document will include: (i) the School System's budget and line item amounts necessary to calculate the per pupil allocation, and (ii) copies of any materials or documentation related thereto that is delivered to the [City Board] for public presentation.  Additionally, the [City Board] agrees to make reasonable efforts to provide to the School Operator background information on the methodology and assumptions behind the calculations as soon as such materials are available.

(Emphasis and bracketed text added, additional footnotes omitted).

The complaints raised a single count for breach of contract.  Specifically, the Charter School Operators asserted that the City Board breached the provision quoted above by failing to provide the Charter School Operators with commensurate funding, and also by failing to provide them with the budget and financial information specified in the provision.

The Charter School Operators claimed that the City Board had "never" provided commensurate funding in line with the *City Neighbors* declaratory rulings formula,[11] and

---

[10] "Applicable Requirements" is defined as "Title 9, federal laws and regulations, all other state laws and regulations, all [City Board] [p]olicies, rules[,] and regulations, all [Baltimore City] School System guidance and requirements, all court orders, consent decrees, requirements relating to correct action taken by [the Maryland State Board of Education], and [Maryland State Department of Education] requirements."

[11] Although the Charter School Operators did not cite to a specific State Board ruling, subsequent filings clarify that they were referring to the *City Neighbors* declaratory ruling.

that the City Board has instead repeatedly "unilaterally changed their methodology in developing the amount to be disbursed to charter schools." And, they more specifically asserted that the City Board failed to provide the Charter School Operators with commensurate funding for Fiscal Year 2016, i.e., the 2015-16 school year.

According to the Charter School Operators, the Baltimore School System's Chief Financial Officer provided charter schools with a "Revised Per Pupil" allocation for the 2015-16 school year of $9387. The Charter School Operators maintained that per-pupil figure "reflected an expectation that the State of Maryland . . . would cut State funding to the System by approximately $35 million." However, the City Board ultimately adopted a budget for the 2015-16 school year that "reflected the restoration of over $27 million in State funding and increases of $3 million dollars in City funding and $3 million from 'other revenue sources' as compared to the earlier projections." Nonetheless, the Charter School Operators claimed that the City Board, "without explanation, kept the charter school per pupil at the previously stated [$9387]." That figure is, according to the Charter School Operators, 1.77% less than that provided for charter schools in the 2014-15 school year budget. At the same time, the Charter School Operators asserted that the City Board adopted a budget for traditional (non-charter) public schools that was roughly the same as provided in the 2014-15 school year budget.[12]

---

[12] In addition, the Charter School Operators also alleged that the $9387 represents a decrease below the Fiscal Year 2014 and Fiscal Year 2011 school years, despite significant increases in System funds since Fiscal Year 2011. The Charter School Operators also point out that "[t]he System's total budgeted allocation to . . . charter schools for Fiscal Year

21

The Charter School Operators also claimed that the City Board had not met its contractual requirement to provide detailed information as to its finances and the basis of its calculations of the annual per-pupil commensurate funding allocation. Instead, the Charter School Operators alleged that the City Board "from year to year, arbitrarily presented charter school operators with take-it-or-leave-it charter school per pupil figures derived using varying (or no) calculation methodology, inflated estimates of overall System enrollment, and unsupported and dubious financial and budget figures." Specifically, they claimed that for the 2015-16 school year, the City Board provided only two single page documents in support of the $9387 "Revised Per Pupil" allocation.

b. *Initial Motions to Dismiss or Stay the Action*

The City Board filed motions "to dismiss, or in the alternative, motion to stay" the complaints. In an accompanying memorandum, the City Board contended that "at the heart" of the Charter School Operators complaints were the alleged failure of the City Board to provide commensurate funding for charter school students as required under ED § 9-109. The City Board insisted that under the primary jurisdiction doctrine the commensurate funding dispute is "for the State Board to decide in the first instance."[13]

---

2016 . . . represents 9.3% of the total System budget . . . even though charter school students are more than 15% of the total enrollment."

[13] The City Board also contended that the Charter School Operators failed to make a *prima facie* case for breach of contract and failed to allege exhaustion of contractual remedies.

The Charter School Operators opposed the City Board's motions, asserting that the circuit court, and not the State Board, "has proper jurisdiction over this breach of contract action." They also noted that the relief they were seeking included "monetary damages," which they contended was not available in a declaratory action before the State Board. In the alternative, the Charter School Operators insisted that "[e]ven if the State Board had jurisdiction and [was] able to provide the [Charter School Operators] with relief," the State Board had already issued a "comprehensive" interpretation of commensurate funding under ED § 9-109, which was "litigated through final affirmance by the Court of Appeals." Thus, they claimed that "'primary jurisdiction' has already been satisfied." Finally, they requested that even if the court determined that the commensurate funding dispute needed to first be resolved by the State Board, the court should permit the matter to proceed through the discovery phase of litigation in circuit court and merely stay any ruling on a motion for summary judgment or beginning a trial on the breach of contract claim pending the decision of the State Board.[14]

On January 8, 2016, Judge Rubin held a hearing on the City Board's motion to dismiss, at which both parties offered extensive arguments as to whether the State Board had primary jurisdiction over the parties' dispute. The City Board argued that, although the case was a breach of contract action, the claim that the City Board did not provide funding for charter schools that was commensurate with funding provided to traditional

---

[14] The Charter School Operators also contended in their motion that they had stated sufficient factual allegations to satisfy the elements of a breach of contract claim, and that they had satisfied the pre-suit notice requirements of the contract.

public schools "boils down to whether there has been compliance with [ED § 9-109]." The City Board argued that, under this Court's holding in *City Neighbors*, ED § 9-109 was ambiguous and the State Board had the primary authority to interpret it. The City Board acknowledged that the State Board had previously set forth a working definition of commensurate funding and a formula for calculating that funding in the *City Neighbors* declaratory rulings, but insisted that neither the State Board nor this Court has ever said "that is the only formula that can be used." The circuit court questioned the City Board's counsel on that point, resulting in the following exchange:

| | |
|---|---|
| Judge Rubin: | So the question that really I think where the rubber meets the road in this instance is has the issue of commensurate funding already been determined and so to send it back [to the State Board] is not only unnecessary, but, arguably, inefficient and potentially unfair[.] . . . [T]he flip side is that every single time a charter school takes issue or challenges that proper commensurate funding has been placed, at least the way I see the logical extension of your arguments is that . . . the State Board of Education will always be entitled to make that a moving target. |
| City Board Counsel: | But that's what [the State Board has] said in their opinions. I agree with that. If they came out with -- if the statute said this is what you need to do and here are the details or if [the State Board] came up with a regulation that said this is exactly how it needs to be done . . . then I would say no[.] [B]ut in a situation where you have this guidance . . .then I think the State Board of Education should weigh in on these issues and has to weigh in on these issues . . . . |

24

In response, the Charter School Operators argued that under some circumstances, a party may elect to proceed before the circuit court for its breach of contract claim even if that claim implicated provisions of the Education Article. Specifically, they contended that "once the State Board has had the opportunity to have a crack at interpreting its statutes," parties may file a claim dependent on that interpretation before the circuit court. And, they disputed the City Board's contention that the State Board would have discretion to depart from its previous interpretation and formula for calculating commensurate funding if the parties' dispute proceeded to adjudication before the State Board.

The Charter School Operators also opposed the City Board's alternative request that the case be stayed. They pointed out that their claim that the City Board had breached its contractual obligations to provide information as to its budget and finances did not depend on the interpretation of a statute or regulations by the State Board and was "squarely before only the [c]ircuit [c]ourt." They also argued that if the case proceeded before the State Board, discovery to obtain that information would be restricted compared to the discovery available in circuit court. The Charter School Operators therefore contended that even if the court found that the commensurate funding dispute was in the primary jurisdiction of the State Board, rather than grant a stay, the court should permit the case to proceed through discovery in the circuit court. Finally, they requested that if any issue in the case needed to go before the State Board, that the court issue "very specific instructions as to what exactly the State Board would need to accomplish or could accomplish on any proceeding that would be appropriate," and also explain how to "bring this [matter] back to [the circuit court] for actual resolution and remedies."

During the hearing, Judge Rubin noted that the City Board's reluctance to disclose the facts supporting the commensurate funding calculations left the Charter School Operators in a disadvantaged position considering the "illusory" nature of commensurate funding:

Judge Rubin: [T]o the extent that the concept of commensurate funding or what it means in each charter school contract could be different from the next charter school contract because there are different things in play, as [City Board has] argued, on some level does this not raise an issue that in essence when the charter school contracts for, among other things, its commensurate funding, that its entitlement to whatever commensurate funding is . . . somewhat illusory? In other words, we'll tell you what it is once you complain that we haven't given it to you.

Judge Rubin thereafter issued a comprehensive oral ruling from the bench, in which she ultimately determined that the State Board had "provided sufficient guidance" regarding the meaning of commensurate funding, including the "requisite factors to be considered, the data to be considered." She therefore concluded that the circuit court was "no longer obliged to punt the issue to the expertise of the administrative body," but rather, it was entitled "to decline to invoke primary jurisdiction."[15] Accordingly, she denied the motion to dismiss.

c. *The City Board's Initial Petition for Declaratory Ruling*

---

[15] Judge Rubin also held that the complaints did state sufficient facts that, if accepted as true, could support a breach of contract claim. And, she agreed that the Charter School Operators had complied with the contractual pre-suit notice requirements.

On November 9, 2015, the same day that the City Board filed its motions to dismiss the complaints in the circuit court, it also filed a petition with the State Board, requesting that the State Board declare that its funding formula complied with ED § 9-109 and resulted in commensurate funding. The Charter School Operators thereafter moved to dismiss the declaratory petition. After Judge Rubin denied the City Board's motions to dismiss before the circuit court, the State Board dismissed the City Board's petition for declaratory ruling. In a written order, the State Board noted that the circuit court had "asserted its jurisdiction" on the issue, and it did not serve the interests of conserving judicial (and quasi-judicial) resources to have parallel proceedings.

The State Board also addressed whether it should stay or dismiss the declaratory petition, and explained that the City Board had failed to present it with sufficient facts from which it could declare the law:

> Having reviewed the Petition, **we find that it fails to present any facts concerning the funding formula that the Baltimore City Public School System (BCPSS) actually used to fund the charter schools**. . . . The Petition is, in essence, a request for an evidentiary hearing at which time BCPSS states that it will present the facts and the formula it used.
>
> A request for a declaratory judgment must present a "justiciable controversy, rather than abstract, hypothetical, or contingent questions." *Miller v. Augusta Mut. Ins. Co.*, 157 F. App'x. 632, 637 (4th Cir. 2005). The Petition here presents no concrete facts from which we could declare the law.

(Emphasis added). The Charter School Operators requested that the State Board compel the City Board to disclose its commensurate funding information. In a request for an appeal in front of the State Board, a party must provide "a statement of the facts necessary to an understanding of the appeal." COMAR 13A.01.05.02(A)(3). While an appellant may

27

request to "present additional evidence on the issues in an appeal," the State Board must first deem the additional evidence as "material" and "that there were good reasons for the failure to offer the evidence in the proceedings before the local board." COMAR 13A.01.05.04(C). After satisfying these factors, the State Board may, but is not required to: (a) "[r]emand the appeal to the local board for the limited purpose of receiving the additional evidence," or (b) "[r]eceive the additional evidence." COMAR 13A.01.05.04(C). Here, the Charter School Operators did not possess the "additional evidence" of commensurate funding information and thus did not have the ability to present "additional evidence" in its petition to the State Board. Adhering to the confines of COMAR, the State Board was unwilling, and statutorily unable, to conduct evidentiary hearings regarding the disputed commensurate funding information.

### d. *Further Proceedings Before the Circuit Court*

Subsequently, the City Board filed a counterclaim against the Charter School Operators before the circuit court. In the counterclaim, the City Board contended that it had provided the Charter School Operators with administrative services whose value were significantly greater than 2% of the charter schools' commensurate funding allocation, and that the 2% cap on administrative services stated in the *City Neighbors* declaratory rulings should only apply to mandatory functions "that may only be performed by the central office of a local school system." The City Board therefore requested that the circuit court issue a declaratory ruling stating which services provided to charter schools were "mandatory" and subject to the 2% deduction. And, the City Board requested that either the value of the additional, non-mandatory services provided be counted as commensurate funding

28

received from the City Board, or in the alternative, that the Charter School Operators be required to reimburse the City Board for the cost of those services to prevent unjust enrichment.[16]

The Charter School Operators moved to dismiss the City Board's counterclaim for failure to state a claim upon which relief can be granted.[17] On April 18, 2016, the circuit court held a hearing on the Charter School Operators' motion to dismiss. At that hearing, Judge Nance questioned counsel about the procedural history of the case:

> May I beg a question of both parties -- or both sides, if you would, please? Tell me procedurally what happened in this case, procedurally in terms of what [the Charter School Operators] did before it got to being a litigation in the Circuit Court for Baltimore City. . . . My understanding is, is that if there is a dispute, the dispute is raised with the local board. If there is a problem in the resolution by the local board there is an administrative process. That is the reason for my question. . . . **Tell me what happened that causes you to rightfully be in my courtroom.**

(Emphasis added). Counsel for the City Board responded to the judge's question:

> I wish I were in front of you I think in January we had a hearing on a motion to dismiss where we argued exactly what Your Honor is stating, the doctrine of primary jurisdiction that this case should be stayed in favor of the State Board . . . making a determination of these issues and our motion was denied.

---

[16] The counterclaims also made a number of breach of contract claims against the Charter School Operators.

[17] The Charter School Operators asserted that the City Board's claim for declaratory relief should be dismissed because the issue it raised was already included in the Charter School Operators' complaints. They also claimed that the City Board's unjust enrichment claim should be dismissed because such claims are unavailable when there is an express contract between the parties. Finally, as to the breach of contract claims asserted by the City Board in its counterclaims, the Charter School Operators maintained that the City Board had not provided sufficiently detailed factual allegations to meet the Maryland pleading requirements for those claims.

Counsel for the City Board also informed the judge that there had been an administrative proceeding pending before the State Board, but that it had been dismissed after Judge Rubin's order directing that the case proceed to trial.

Judge Nance thereafter took a brief recess during which he "had an opportunity to review . . . part of the matters procedurally in chambers." Upon returning to the bench, the judge noted that the City Board "would like to make an oral motion at this time." The City Board then moved to dismiss "on the basis that the appropriate tribunal or court or body to hear this matter is the State Board of Education." Citing *City Neighbors*, counsel for the City Board stated that the "case law is very clear that [the State Board] should be the first one to take up matters such as the ones that have been raised by the Plaintiff here relating to intricate, detailed, and important issues of public policy relating to education and educational funding."

Counsel for the Charter School Operators responded that the claim raised in their complaints was for breach of contract, and the resolution of such disputes is for the courts and did not need to first be resolved by the State Board. He also argued that proceeding before the State Board would provide no remedy in the form of monetary damages. And, he argued that the issue of commensurate funding had already been settled and affirmed by the courts, thus "satisfying the requirements of primary jurisdiction of letting the administrative agency have a crack at setting out the interpretation."

At one point in the hearing, Judge Nance questioned counsel for the Charter School Operators as to what proceedings had taken place before the City Board. Counsel

responded that the Charter School Operators had not sought a hearing or opinion from the City Board. Later in the hearing, Judge Nance stated the following:

> I want to make sure that **this [c]ourt** says specifically that it **believes that [the Charter School Operators] have a duty to seek administrative review of a local [school] board and if not [then the State] Board** as to that which is asserted and claimed by [the Charter School Operators] in this case for there to be an administrative review as to your claims before it comes to the [c]ircuit [c]ourt.

(Emphasis added).

At the conclusion of the hearing, Judge Nance granted the Charter School Operators' motion to dismiss the City Board's counterclaims without prejudice. The judge also determined that, while granting the City Board's verbal motion to dismiss was not appropriate, "in lieu of [the City Board's] motion to dismiss, this [c]ourt is granting an order to stay as to these matters pending administrative review and appeal." The following day, Judge Nance entered a written order to that effect, which in pertinent part ordered that the consolidated action was stayed "pending administrative review of the parties' dispute by the State Board of Education" (the "Stay Order").

### e. The City Board's Second Petition for Declaratory Ruling

After the Stay Order was issued, the City Board filed a second petition for declaratory ruling before the State Board.[18] Unlike in its initial petition for declaratory relief filed before the State Board, the City Board provided a partial explanation of its

---

[18] A partial copy of the second petition was included in the Appendix to the City Board's brief to this Court. That copy did not include any of the exhibits referenced in the petition.

charter school funding formula for the 2015-16 school year. The City Board stated that the City School System's "Total Operating Budget, for the 2015-16 school year was $1,322,461,846." The City Board explained that in calculating charter schools funding, it began by excluding numerous categories of funds from that figure, including: "restricted funds,"[19] funds for debt servicing, adult education, retiree health benefits, pre-kindergarten,[20] and "non-public education,"[21] contributions from the City School System's

---

[19] The declaratory petition asserted that the City School System segregates funds in its budget into three categories: the General Fund, the Special Fund, or the Enterprise Fund. According to the City Board, "the Special Fund and the Enterprise Fund are restricted" and funds in those categories "can only be used for certain purposes." It is unclear from the petition, however, if the restrictions on the use of those funds derive from State or federal law, or from City Board policy. The City Board also stated in the petition that "individual charter schools receive upward adjustments to the base cash per-pupil for all restricted funds to which they are entitled." But it is unclear whether the Charter School Operators would be entitled to receive any of the funds labelled as restricted, and if so, the amounts to which they would be entitled.

[20] The declaratory petition asserted that Baltimore City calculated "full-day [pre-kindergarten] to [be] approximately 4,000 students," a population spread across both traditional public schools and some charter schools. The City Board maintained that it provides "the same level of financial support . . . on the same basis" to all schools providing pre-kindergarten. However, the City Board asserts that it excludes funding for the program from its charter funding allocation, and does not count those students towards its overall enrollment total, "[b]ecause the [pre-kindergarten] program benefits all schools, both traditional and charter, and is an underfunded expense that City Schools is required to provide[.]"

[21] The City Board asserted in its petition that for a small population of students "with physical, emotional, and developmental needs that cannot be adequately met in Baltimore City public schools," it is required by law to "pay for alternative placements" in private schools for those students.

32

annual fund balance[22] and "non-state/local revenue,"[23] funding for special education students, funding for students with limited English language proficiency ("ESOL" funds), and funding for specialized transportation services, primarily for special education students. The excluded funds amount to $572,978,187, or slightly over 43% of the City Board's total operating budget for the 2015-16 school year.

The City Board stated that its total budget after "adjusting" for the restricted funds was $749,483,659. The City Board explained that it divided that figure by the population of students enrolled in kindergarten through the twelfth grade in the City School System from the previous year, 78,631, to reach a per-pupil figure of $9532. The City Board explained that it then deducted 2% from that figure for central administrative costs, as permitted by prior State Board precedent. And, the City Board stated that it added an additional $46 to the per-pupil total as part of a "negotiated adjustment,"[24] to reach a "base cash charter per pupil allocation" of $9387.

_____

[22] The fund balance is "money that was not used in prior operating years." In some years, the City School System funds a portion of its budget expenses with a contribution from the fund balance.

[23] The City School System lists earnings from certain sources separately, including "interest on investment earnings, tuition payments from students who live outside of Baltimore City, payments for rental and special use of [its] buildings, revenue from cellular telephone towers placed on [its] buildings, vending machine contracts, and other revenue sources." The City Board contends these sources are "not federal, state, or local appropriations for K-12 education."

[24] In the declaratory petition, the City Board asserts that it "agreed" to a "placeholder" base cash per-pupil figure of $9387 early in 2015 in order to provide "budget stability" for charter schools while it was waiting for final figures for the State contribution to its budget and projected enrollment. Once the final figures were received, the base cash-per pupil under its formula was $9341, which was $46 less than the $9387 figure it had

Finally, the City Board then added to the $9387 proposed allocation the cost of various "needs-based" services that it provides "in-kind" to charter schools, which it valued at $3496, to reach a total figure of both cash and in-kind services of $12,883. It contended that figure was slightly higher than would have been reached under the approved State Board methodology, and thus was "commensurate" funding under ED § 9-109 and State Board guidance.[25] Furthermore, the City Board contended that its funding formula, including all of the exclusions and its insistence on providing certain services "in-kind" instead of as a cash allocation, was consistent with State Board precedent. Therefore, the City Board requested that the State Board declare that it had provided commensurate funding for the 2015-16 school year.

However, the City Board also asked that the State Board reconsider some of the guidance it had provided in the *City Neighbors* declaratory rulings. Specifically, the City Board contended that the limitation that it can only deduct up to 2% of a charter school's funding allocation for the cost of central administrative services "does not remotely cover the true cost of those services, resulting in an unfair subsidy for charter schools." The City Board therefore requested that the State Board entirely "eliminate the 2% cap or lift it to

---

previously provided to charter schools. However, it elected not to modify the original figure.

[25] The City Board also contended that, in reviewing whether its funding formula resulted in commensurate funding, the State Board should apply the deferential standard of review stated in COMAR 13A.01.05.05(A)-(C), under which the decision of the City Board would be considered "prima facie" correct unless "arbitrary, unreasonable, or illegal."

cover the actual cost of all services" that the City Board provides centrally. In the alternative, the City Board requested that if the State Board reaffirms the 2% cap, that it "clarify that the 2% cap covers only a limited number of services and that City Schools can require reimbursement from charter schools for [additional services.]"[26]

The Charter School Operators filed a motion to dismiss the State Board's petition, contending that it was "outside of the State Board's jurisdiction because it asks for extensive fact finding instead of interpretation of laws," and because they had appealed the circuit court's Stay Order to the Court of Special Appeals. In the State Board's order, the State Board considered the disposition of the "ongoing dispute." The State Board specifically referenced Judge Rubin's holding that "the Circuit Court had proper jurisdiction" when the circuit court denied the petition to dismiss Charter School Operators' complaint. The State Board then stated that "the Circuit Court case is stayed and that [the Charter School Operators] have appealed the stay to the Court of Special Appeals." As a result, the State Board held that the "case remains pending in the judicial system" and entered an order dismissing the petition "because the case remains within the jurisdictional purview of the courts."

   f. *Appeal to the Court of Special Appeals*

The Court of Special Appeals stated that the Charter School Operators had presented a single issue before it on appeal, which it had rephrased:

_____

[26] The City Board also requested that the State Board clarify whether the deduction is 2% of its total operating budget, or 2% of its total operating budget minus permissible deductions.

35

Did the circuit court err in staying the proceedings pending administrative review on the ground that the State Board has primary jurisdiction over the issues raised in the complaint?

*Monarch Acad.*, 231 Md. App. 594, 600 (2017).  However, the court declined to resolve that issue.  Instead, it determined *sua sponte*[27] that "the circuit court's order is not an appealable order," because it was neither a final judgment nor an appealable order under the collateral order doctrine, and therefore dismissed the appeal.  *Id.* at 600, 619.

The Court of Special Appeals noted that "to constitute a final judgment, a trial court's ruling 'must either decide and conclude the rights of the parties involved or deny a party the means to prosecute or defend rights and interests in the subject matter of the proceeding.'"  *Id.* at 613 (quoting *Md. Bd. of Physicians v. Geier*, 451 Md. 526, 545 (2017)).  The intermediate appellate court determined that the Stay Order "did not conclude the rights of the parties or adjudicate all of the claims in the action."  *Id.* at 613–14.  And, relying on federal case law, the court concluded that the Stay Order did not have the effect of putting the Charter School Operators out of court, "because it merely directed that the parties first go to the State Board[.]"  *Id.* at 613-15 (discussing *Crystal Clear Commc'ns,*

---

[27] Before the Court of Special Appeals, the City Board filed a motion to dismiss the appeal on the ground that the circuit court's stay order was not an appealable order. *Monarch Acad.*, 231 Md. App. at 612 n.10.  The court denied the motion, "with leave to seek that relief in Appellee's brief," but the City Board did not "include a motion to dismiss in its brief or request a ruling on whether the Stay Order was an appealable order." *Id.*  Nor was the issue raised in oral argument before the court. *Id.*  Nonetheless, after oral argument, the court "requested the parties to address whether the Stay Order was an appealable order" in written supplemental filings. *Id.*  The City Board thereafter "filed a memorandum stating its view that the Stay Order was not an appealable order," but also requested that the Court of Special Appeals "in the interest of judicial economy and jurisdictional clarity," issue a ruling on the merits and hold that the State Board had primary jurisdiction over the dispute.

*Inc. v. SW Bell Tel. Co.*, 415 F.3d 1171, 1175-78 (10th Cir. 2005) and *Occidental Chem. Corp. v. Louisiana Pub. Serv. Comm'n*, 810 F.3d 299, 305-307 (5th Cir. 2016)). The court also held that the Stay Order was not appealable under the collateral order doctrine. *Id.* at 615-19.

### F. Appeal to this Court and Questions Presented

The Charter School Operators filed a petition for writ of certiorari to this Court from the decision of the Court of Special Appeals, which we granted on April 4, 2017. *Monarch Acad.*, 452 Md. 523 (2017). In the petition, the Charter School Operators presented several issues for our review, which we have rephrased and reordered:

1. Is the circuit court's Stay Order an appealable order?

2. Did the circuit court abuse its discretion in entering the Stay Order prior to the conclusion of discovery and without providing guidance to the parties?

3. Does the doctrine of primary jurisdiction require that proceedings before the circuit court be stayed in order to permit the State Board to resolve the issue of whether the City Board has provided the Charter School Operators with commensurate funding?[28]

---

[28] In their petition for writ of certiorari, the Charter School Operators presented the following three questions for review:

1) Is a trial court's issuance of an indefinite stay of plaintiffs' action, requiring "administrative review of the parties' dispute," an appealable order where it imposes a condition that (a) is beyond the control of the plaintiffs to satisfy and (b) requires that plaintiffs undertake actions that even if satisfied would substantively impair plaintiffs' substantive and procedural rights?

2) Did the trial court err in determining that the State Board of Education has "primary jurisdiction" over the Charter School Operators' contract actions and, as a consequence, staying the proceedings "pending administrative review of the parties' dispute by the State Board of Education?"

3) If Question (2) is answered in the negative, then what process is available to plaintiffs both at the State Board and then in court that would permit their claims to be fully

**STANDARD OF REVIEW**

The issue of whether the circuit court's Stay Order is a final and appealable judgment, or is appealable even if not a final judgment under the collateral order doctrine, is a question of law that an appellate court reviews *de novo*. *Balt. Home All., LLC v. Geesing*, 218 Md. App. 375, 381 (2014). Likewise, whether the State Board has primary jurisdiction over some or all of the issues raised by the Charter School Operators, so that they "must exhaust administrative remedies" before the State Board prior to seeking review in circuit court is "a legal issue which the Court of Appeals reviews *de novo*." *United Ins. Co. of Am. v. Maryland Ins. Admin.*, 450 Md. 1, 14 (2016); *see also Falls Road Community Ass'n, Inc. v. Balt. Cty.*, 437 Md. 115, 134 (2014).

As to the circuit court's *sua sponte* entry of the Stay Order "in lieu" of dismissing the Charter School Operators' complaints, a court's decision to grant or deny a stay order is generally within its discretion, and is reviewed for an abuse of discretion. *Fishman v. Murphy ex rel. Estate of Urban*, 433 Md. 534, 546 (2013); *see also Geier v. Maryland State Bd. of Physicians*, 223 Md. App. 404, 450 (2015), *reconsideration denied* (July 31, 2015); *Bechamps v. 1190 Augustine Herman, LC*, 202 Md. App. 455, 460 (2011). There is an abuse of discretion when the trial court ruling was "clearly against the logic and effect of facts and inferences before the court[ ] . . . or when the ruling is violative of fact and logic." *Fishman*, 433 Md. at 546 (quoting *Aventis Pasteur, Inc. v. Skevofilax*, 396 Md. 405, 419

---

heard and adjudicated, with relief granted, and that would not deprive Petitioners of their substantive rights?

(2007)).  In order to be reversed a circuit court's decision generally must be "well removed from any center mark imagined by the reviewing court and beyond the fringe of what that courts deems minimally acceptable."  *Skevofilax*, 396 Md. at 418-19 (quoting *Wilson v. John Crane, Inc.*, 385 Md. 185, 198-99 (2005)).

## DISCUSSION

"In Maryland, appellate jurisdiction, except as constitutionally created, is statutorily granted."  *Schuele v. Case Handyman & Remodeling Servs., LLC*, 412 Md. 555, 565 (2010).  And, "[w]here appellate jurisdiction is lacking, the appellate court will dismiss the appeal on its own motion."  *Id.* (quoting *Gruber v. Gruber*, 369 Md. 540, 546 (2002)).  Therefore, we must first decide whether the Stay Order is appealable before turning to whether the Stay Order was an abuse of discretion, and whether the underlying commensurate funding issue must be referred to the State Board under the doctrine of primary jurisdiction.

### A.  *Appealability of the Stay Order*

#### a.  *Finality of Judgment*

Pursuant to Maryland Code, Courts & Judicial Proceedings Article ("CJ") § 12-301, a party may generally appeal only from "a final judgment entered in a civil or criminal case by a circuit court."[29]  However, as the Court noted in *Metro Maintenance Systems South,*

---

[29] "[T]here are only three exceptions to that final judgment requirement: appeals from interlocutory orders specifically allowed by statute; immediate appeals permitted under Maryland Rule 2-602; and appeals from interlocutory rulings allowed under the common law collateral order doctrine."  *Addison v. Lochearn Nursing Home, LLC*, 411 Md. 251, 273 (2009) (quoting *Salvagno v. Frew*, 388 Md. 605, 615 (2005)).  Here, the circuit court did not expressly "direct the entry of final judgment" as required for an

*Inc. v. Milburn*, CJ § 12-301 "does not define finality, but instead leaves it to this Court to determine what makes a judgment 'final.'" 442 Md. 289, 297 (2015).

This Court has "often stated that the purpose of the final judgment rule is to avoid piecemeal appeals . . . and [that] the reason for avoiding piecemeal appeals is the promotion of judicial efficiency." *Brewster v. Woodhaven Bldg. & Dev., Inc.*, 360 Md. 602, 616 (2000). One important aspect of judicial efficiency is avoiding the "interruption of the trial court process by repeated application to appellate courts." *Id.* Specifically:

> Postponing review until the final judgment, or minimizing the number of occasions for interlocutory appeal, also is important to avoid interference with the trial process. . . . Repeated interruptions of the trial court process . . . may require wasteful losses of familiarity with the case by court and perhaps counsel as well.

*Id.* (quoting Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, 15A Fed. Practice & Proc. § 3906, 277 (2d ed. 1991)). The Court has emphasized that such an invidious interruption of the trial process "cannot occur" when there is a grant of a motion to transfer a case to another venue or court, explaining that "[i]n the transferring court,

---

immediate appeal under Rule 2-602(b). Nor is this a permissible interlocutory appeal under statute. CJ § 12-303 describes the interlocutory orders that a party may appeal from in a civil case. However, none of the parties has contended that the circuit court's stay order is an appealable interlocutory order under that statute, and the stay order does not fit in any of the permissible categories of appealable orders listed in the statute.

The Charter School Operators do contend that this Court has appellate jurisdiction to resolve this appeal under the collateral order doctrine. However, we have held that "the collateral order doctrine in Maryland is very limited" and that it "should be applied sparingly in only the most extraordinary circumstances." *Schuele*, 412 Md. at 572 (internal quotation marks and citations omitted). As we believe that the appealability of the circuit court's Stay Order can be resolved under the final judgment rule, we need not reach the Charter School Operators arguments as to the collateral order doctrine.

there are no longer any proceedings to interrupt, for the proceedings have been terminated[,]" while "[i]n the receiving court, the proceedings cannot be interrupted, because they have not yet begun." *Id.*

The Court has also provided guidance as to when a judgment is "final" and appealable. We have held that "[i]n order to be an unqualified, final disposition, an order of a circuit court must be 'so final as either to determine *and conclude* the rights involved **or** to deny the appellant the means of further prosecuting or defending his or her rights and interests in the subject matter of the proceeding.'" *Metro Maintenance*, 442 Md. at 299 (quoting *Rohrbeck v. Rohrbeck*, 318 Md. 28, 41 (1989)) (italicized emphasis in original) (additional emphasis added). Thus, "[e]ven if the order does not decide and conclude the rights of the parties, it nevertheless will be a final judgment if it terminates the proceedings in that court and denies a party the ability to further prosecute or defend the party's rights concerning the subject matter of the proceeding." *Id.* Such an order has been described as one that "**has the effect of 'put[ting] the [party] out of court**.'"[30] *Id.* (quoting *McCormick v. St. Francis de Sales Church*, 219 Md. 422, 426-27 (1959)) (emphasis added).

---

[30] In *Metro Maintenance*, the Court also identified two other "attributes" that a ruling "ordinarily" must have in order to be a final judgment: "unless the court acts pursuant to Maryland Rule 2-602(b) to direct the entry of a final judgment as to less than all of the claims or all of the parties, it must adjudicate or complete the adjudication of all claims against all parties" and "it must be set forth and recorded in accordance with Rule 2-601." 442 Md. at 298.

In the instant case, the circuit court's Stay Order stayed all claims in the consolidated actions before it pending administrative review by the State Board. Therefore, the Stay Order was a decision that affected "all claims against all parties" in the case. And, the question of whether the Stay Order was effectively an "adjudication" of those claims is subsumed in the question of whether the Stay Order was a final disposition of the matters

41

We have held that the "key question" as to whether an order that terminates

proceedings in a particular court has the effect of putting a party out of court is "whether

the order contemplates that the parties will no longer litigate their rights in that court." *Id.*

In *Metro Maintenance*, we referenced our holding in *Moore v. Pomory*, 329 Md. 428, 431

(1993) as providing an "illustration" of the distinction between "an order that terminates

the proceedings in a particular court and one that does not":

> In [*Moore*], the Court held that an order dismissing a complaint in its entirety "without prejudice" was a final judgment because it terminated the proceeding in the particular court. **By contrast, the Court stated, an order of dismissal that expressly allows a plaintiff to file an amended complaint does not terminate the proceedings, as it anticipates further proceedings in the same court**. Although a party has no obligation to file an amended complaint and there may be no further proceedings, the case remains pending in the event an amended complaint is filed. **Once an amended complaint is filed, the parties may continue to litigate their interests in the same proceeding before the same court**. Thus, when an order anticipates additional proceedings in the same court during which the parties may continue to litigate their rights in the particular matter, the order does not terminate the proceedings in that court, and is not a final judgment.

---

before the court that had the effect of putting the Charter School Operators out of court. *See e.g.*, Black's Law Dictionary (10th ed. 2014) (defining "adjudication" as a "judgment," which is "[a] court's final determination of the rights and obligations of the parties in a case").

The remaining attribute of proper recordation under Rule 2-601 is "a creature of court rule." *Hiob v. Progressive Am. Ins. Co.*, 440 Md. 466, 489 n.21 (2014). Accordingly, "parties may waive the separate document requirement" on appeal. *Id.* Here, that is precisely what occurred; neither party has raised the issue of Rule 2-601 recordation before this Court. Furthermore, before the Court of Special Appeals, the City Board explicitly asked that court to issue a ruling on the merits of the primary jurisdiction dispute "in the interest of judicial economy and jurisdictional clarity[,]" despite the lack of recordation of judgment. Therefore the issue of recordation of judgment under Rule 2-601 has been waived.

*Metro Maintenance*, 442 Md. at 300-301 (emphasis added). We have consistently recognized that any order that contemplates parties will no longer litigate their rights in that court is a final judgment. *See e.g., Brewster*, 360 Md. at 615–16 (holding that an order of the circuit court transferring a case to another circuit court under venue or *forum non conveniens* grounds is an appealable final judgment because no further proceedings will occur in the court of original jurisdiction); *Ferrell v. Benson*, 352 Md. 2, 7 (1998) (holding that an order transferring a case from circuit court to District Court is a final judgment because it terminates the proceedings in the circuit court, even though proceedings continue in the District Court); *Horsey v. Horsey*, 329 Md. 392, 402 (1993) (holding that an order compelling arbitration is a final judgment because it terminates the proceedings in that court, even if proceedings continue before the arbitrator).

The issue before the Court in *Metro Maintenance* was whether a circuit court's remand of a case to an administrative agency for further proceedings, prior to the circuit court conducting any review of the agency's decision, was a final judgment. 442 Md. at 293-94. In that case, a truck driver quit his job, claiming racially motivated mistreatment, and applied for unemployment benefits to the Department of Labor, Licensing, and Regulation ("DLLR"). *Id.* at 294. A DLLR claim examiner denied him benefits on the grounds that he had quit his job "without good cause*." Id.* Mr. Milburn appealed within the agency, but the claim examiner's ruling was upheld by a hearing examiner, and then adopted by the DLLR Board of Appeals. *Id.* at 295. Mr. Milburn thereafter appealed to the circuit court. *Id.* However, before the circuit court, the DLLR filed a motion requesting that the court remand the case to the agency before the court conducted its judicial review

43

so that the Board could review the hearing examiner's decision. *Id.* at 296. The circuit

court granted the remand request, without reaching the merits of the claims on appeal. *Id.*

In evaluating whether the remand order was a final and appealable judgment, we

noted that many remands by a circuit court to an agency, which by their nature contemplate

additional proceedings before the agency, "may appear to be non-final in nature[.]" *Id.* at

301. However, we stated that under "principles of finality" in Maryland administrative

law, "many such remands are appealable final judgments." *Id.* at 301.[31] Applying those

principles, we considered whether the remand order at issue put the parties effectively out

of court. *Id.* at 308. We concluded that it did not, and that "the work of the [c]ircuit [c]ourt

here is not done" and explained:

> Unlike an order transferring a case to another circuit court, to the District
> Court, or to an arbitration panel, the remand order here contemplates that
> judicial review awaits the return of the case following the remand.
> Specifically, once the Board has an opportunity to review its decision, and
> possibly correct what it perceives as an omission or defect, the [c]ircuit
> [c]ourt would then . . . determine whether the decision reflects a correct
> understanding of the law and whether there is "competent, material, and
> substantial" evidence to support it. This type of remand is thus nothing more
> than a brief delay in the ongoing review of the agency decision . . . that did
> not divest [the circuit court] of its continuing jurisdiction over the case. It is
> not a termination of the proceedings in that court.

*Id.* at 308-09 (internal quotation marks and citations omitted). We also concluded that the

remand at issue was "akin to the example that the Court offered in *Moore* of a non-final

---

[31] Specifically, we held that as a general rule "a remand after a circuit court has
conducted judicial review that precludes the parties from further contesting or defending
the validity of the agency's decision in that court—and leaves nothing further for the court
to do—is a final judgment." *Metro Maintenance*, 442 Md. at 304.

44

order—dismissal of a complaint with leave to amend." *Id.* at 309. We explained that while, in both instances, "the parties have, in a sense, been 'put out of court,' . . . in both cases there is a strong potential, bordering on certainty, that the issue at hand . . . will be back for determination by the circuit court." *Id.*

### b. *The Court of Special Appeals Opinion*

The parties have not presented, and we have not found, any Maryland cases in which courts have had occasion to apply the final judgment principles elucidated in *Metro Maintenance* and the other cases discussed above to the specific circumstances presented in this case—where a circuit court determines under the doctrine of primary jurisdiction that a party must exhaust his remedy before an administrative agency prior to the court ruling on an issue in the case before it, and stays proceedings to permit that party to exhaust the administrative remedy. However, the Court of Special Appeals relied on two federal cases which addressed the appealability of a stay in factually similar situations:

> [I]n *Crystal Clear Commc'ns, Inc. v. SW Bell Tel. Co.*, 415 F.3d 1171, 1173 (10th Cir. 2005), a federal trial court issued an order similar to the one here, staying a lawsuit filed by several payphone providers against Southwestern Bell Telephone Company, pending the resolution of certain issues by federal and state agencies. The United States Court of Appeals for the Tenth Circuit noted that, although a decision to stay litigation ordinarily does not constitute a final judgment, there is an exception for a stay order that puts a party "effectively out of court." *Id.* at 1175 (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 10 n.11 (1983)). The [c]ourt held, however, that the order in that case, staying the proceedings in court pending resolution of certain issues by the agencies pursuant to the primary jurisdiction doctrine, with contemplation of return to court, was not a final decision. *Id.* at 1176-78.

> That is not to say that a stay order pending administrative review can never qualify as a final judgment. In *Occidental Chem. Corp. v. Louisiana Pub. Serv. Comm'n*, 810 F.3d 299, 305, 307 (5th Cir. 2016), the United States

> Court of Appeals for the Fifth Circuit addressed whether an order by a federal court indefinitely staying proceedings to allow the Federal Energy Regulatory Commission to act on an administrative complaint was a final judgment when the court retained jurisdiction for a later determination on the merits. The Fifth Circuit held that the order *in that case* "functioned as a final decision" because it resulted in Occidental being "effectively out of court" for a protracted and indefinite period, and therefore, the order was appealable.

*Monarch Acad.*, 231 Md. App. at 614-15 (italicized emphasis in original). The Court of Special Appeals concluded that the facts of this case are more in line with the Tenth Circuit's holding in *Crystal Clear*, 415 F.3d 1171 (10th Cir. 2005). In a footnote, the court noted that the Charter School Operators would appear to be able to file a petition for declaratory review to the State Board under COMAR 13A.01.05.02(D). *Id.* at 615 n.12. Although the court noted that the State Board had "declined to weigh in on the issue while the matter was simultaneously being pursued in court," it determined that justification for declining to take up a declaratory petition "no longer is applicable." *Id.* at 615. The court therefore concluded that "there is no indication that there will be a substantial delay in obtaining an administrative ruling" and that "the Stay Order does not place the Charter School[] [Operators] 'effectively out of court.'" *Id.*

We agree with the intermediate appellate court that both federal cases—which, like Maryland law, recognize that an order that puts a party effectively out of court is a final judgment—are persuasive authority. However, as we shall explain, we believe that the more apt decision under the circumstances is the Fifth Circuit's holding in *Occidental Chemical Corp.* that a stay order that places a party effectively out of court for a "protracted and indefinite period" is a final and appealable judgment.

46

*c. Analysis*

Generally, a stay order to permit a party to bring a claim before an administrative agency will only **temporarily** put a party "out of court" and will carry with it the "strong potential, bordering on certainty, that the issue at hand . . . will be back for determination by the circuit court" if either of the parties is dissatisfied with the agency's decision and seeks judicial review before the circuit court. *See Metro Maintenance*, 442 Md. at 309. However, under the unique circumstances of this case, the Stay Order issued by the circuit court was a final and appealable order that had the effect of putting the Charter School Operators entirely out of court with no clear procedural path they could follow to return to court within a reasonable period of time.

First, the Stay Order suspended all claims before the circuit court, and no proceeding was pending before the State Board at the time the order was entered. Thus, similar to the transfer of cases between courts discussed in *Brewster*, 360 Md. at 602, 613-19, appellate review of the Stay Order would not interrupt any ongoing trial process or administrative process before the State Board. Therefore, appellate review of the Stay Order does not conflict with the underlying purpose of the final judgment rule of avoiding piecemeal appeals that interrupt the trial court and erode judicial efficiency. In this case, there is simply no pending proceeding before any judicial or quasi-judicial body that would be interrupted by appellate review.

Second, unlike the dismissal without prejudice in *Moore*, 329 Md. at 433, or the remand order in *Metro Maintenance*, 442 Md. at 310, the Stay Order does not specify what, precisely, the Charter School Operators need to do in order for proceedings to resume

47

before the circuit court. The Stay Order merely states that proceedings in the consolidated breach of contract action are stayed "pending administrative review of the parties' dispute by the State Board of Education." It does not specify which issues in the case need to be resolved by the State Board in order for the breach of contract action to resume before the circuit court, or how the Charter School Operators should bring those issues before the State Board for administrative review.

The lack of clarity in the Stay Order might be of no moment if there were a clear procedural mechanism through which the Charter School Operators could bring their breach of contract claim before the State Board and obtain a ruling or decision as to all aspects of that claim. However, the only procedural route available to the Charter School Operators at this juncture—filing a petition to the State Board for a declaratory ruling under COMAR 13A.01.05.02(D)—would not lead to a full resolution by the State Board of their breach of contract claim.

Initially, the State Board may decline to issue a declaratory ruling for issues that do not involve public educational laws or its own regulations. *See* COMAR 13A.01.05.02(D) (stating that a party may file a petition for declaratory ruling by the State Board only as to "the interpretation of a public school law or regulation of the State Board that is material to an existing case or controversy."). Thus, the Charter School Operators will be unable to obtain a declaratory ruling as to the first part of their breach of contract claim, their allegation that the City Board failed to provide them with the budget and financial information specified in the Contract. That allegation does not involve any public school law or State Board regulation; it is a pure contract law claim.

48

The State Board does not have the discretion to refuse to decide an issue involving the interpretation of a public education law or State Board regulation that is material to a live controversy or dispute when such an issue is properly put before it in a declaratory petition. *See e.g.*, *Bd. of Educ. for Dorchester Cty. v. Hubbard*, 305 Md. 774, 788-90 (1986) (citing *Bd. of Educ. of Garrett Cty. v. Lendo*, 295 Md. 55, 65-66 (1982)) (holding that in the instance of a case requiring an explanation of the 'true intent and meaning' of a provision of the Education Article or a State Board bylaw, a litigant has the choice of either going first to the county superintendent under [ED] § 4-205 and then on up the appellate ladder, or going directly to the State Board under [ED] § 2-205" and that "the State Board is required to hear appeals taken under either section 2-205 or 4-205."). Here, it does appear that the Charter School Operators could file a petition with the State Board seeking a declaratory ruling as to a key issue underlying their breach of contract claim, namely, whether the City Board's proposed charter school funding allocation for the 2015-16 school year is commensurate funding under ED § 9-109 and State Board precedent. That petition would certainly present the State Board with the interpretation of a matter of State public educational law.

However, a declaratory ruling issued by the State Board, like any State agency declaratory ruling, generally is based solely "on the facts set forth in the petition." SG § 10-305(b). Accordingly, even when a petition for declaratory ruling raises an issue involving the interpretation of a public educational law or State Board regulation material to an existing case or controversy, the petition must set forth sufficient facts to enable the State Board to declare the meaning of the law. In this case, the State Board has already

49

denied two similar petitions for a declaratory ruling filed by the City Board, stating that it was denying the first petition in part because it lacked "concrete facts from which [it] could declare the law."

Since that denial, the City Board ultimately divulged some details of its funding formula for charter schools for the 2015-16 school year in its second petition for declaratory ruling filed before the State Board. But, that information is incomplete and one-sided, and may not be sufficient for the State Board to determine whether the City Board's proposed funding allocation is commensurate under the complex, multi-step formula and approach developed by the State Board. For instance, the City Board did not fully explain why certain funds were "restricted" and excluded from the calculation of commensurate funding. Nor did the City Board describe which, if any, of the "in-kind" services that it was providing to charter schools instead of cash funding had been affirmatively requested by charter schools. And, the Charter School Operators note in their brief to this Court that they "believe the City Board has not, as a factual matter, used correct, accurate numbers to perform the funding calculation." Thus, the Charter School Operators may still lack sufficient concrete facts and information about the City Board's finances and commensurate funding formula to successfully petition the State Board to declare whether the City Board's proposed funding allocation is commensurate funding.

The State Board does have a procedural option available to it to develop a more detailed factual record as to the City Board's finances and charter school funding formula. As counsel for the Charter School Operators and the City Board discussed in oral arguments before this Court, the State Board does not have dedicated administrative law

50

judges ("ALJs"). However, the State Board **can** refer a case to the Office of Administrative Hearings ("OAH") for a fact-finding hearing before an ALJ. *See* COMAR 13A.01.05.06(C) (providing that, in an appeal or declaratory ruling action before the State Board, "[u]pon review of the record, the State Board **may** transfer the case to the Office of Administrative hearings for the scheduling of a hearing before an administrative law judge.") (Emphasis added). But the decision of whether to transfer a case to the OAH is generally a discretionary matter.[32] And, as a recent State Board decision indicates, the State Board generally declines to transfer petitions for declaratory rulings to the OAH:

> The superintendent [of the Board of Education of Howard County], alleging a host of factual disputes, requests that this case be transferred to OAH. That request is inappropriate in this proceeding. Specifically, in cases in which the parties petition for declaratory rulings, the State Board's legal obligation is to issue an "interpretation of a public school law or regulation of the State Board that is material to an existing [case or] controversy." COMAR 13A.01.05.02(D). Neither that regulation nor the statute giving the State Board authority to interpret the true intent and meaning of State education law, [ED] § 2-205(e), envision that a declaratory ruling proceeding before this Board is one in which the underlying factual controversy between the parties was intended to be resolved. . . .

*In re Bd. of Educ. of Howard Cty. v. Foose*, MSBE Op. No. 17-13 (2017). Thus, if the State Board follows the same policy it stated in *Foose*, the Charter School Operators will

---

[32] COMAR 13A.01.05.07(A) provides that "[t]he State Board shall transfer an appeal to the Office of Administrative Hearings for review by an administrative law judge" under certain circumstances, including "[a]n appeal upon review in which the State Board finds that there exists a genuine dispute of material fact." However, that finding is itself a discretionary matter. And, the Charter School Operators are likely to be unable to dispute the figures provided by the City Board and show a material dispute of fact as to those figures unless and until they can conduct further discovery.

have no further opportunity to obtain information as to the City Board's finances and budget figures before the State Board.

In light of the highly uncertain path forward for the Charter School Operators if they were to file a petition for declaratory ruling before the State Board at the present juncture of the litigation, we are not confident that there is "a strong potential, bordering on certainty" that they would obtain a declaratory ruling from the State Board sufficient to lift the stay and resume proceedings on their breach of contract claim before the circuit court. *See Metro Maintenance*, 442 Md. at 309.

Finally, even assuming *arguendo* that the State Board did elect to grant a declaratory petition and use the administrative procedures available to it to develop a more detailed factual record as to the commensurate funding issue, the proceedings that would follow would likely be indefinite and protracted. If the State Board referred the case to the OAH, the parties would have the opportunity to conduct limited discovery and a fact-finding hearing before an ALJ. COMAR 28.02.01.01 *et seq.* (describing the rules of procedure for discovery and hearings before an OAH administrative law judge).[33] The ALJ designated by OAH could then proceed to make findings, conclusions of law and recommended rulings, which would be referred to the State Board. *See* COMAR 13A.01.05.07(E). The State Board would then need to make a final ruling based on those findings and

---

[33] We note that while discovery is available before the OAH, it is significantly less comprehensive than that available before the circuit court. *Compare* COMAR 28.02.01.13 and 28.02.01.14 (providing for limited written discovery requests and subpoenas before the OAH) with Maryland Rule 2-401 *et seq.* (providing for discovery before the circuit court, including depositions, interrogatories, and requests for production).

recommendations. *See* COMAR 13A.01.05.09. Presumably, given the financial stakes for the parties, the losing party would then start an appeals process before the courts by filing a petition for judicial review of the State Board's decision before the circuit court. *See* COMAR 13A.01.05.11 (summarizing procedures for appealing final decision of State Board to the circuit court). If that appeals process was followed to its full extent, with additional appeals to the Court of Special Appeals and this Court—as occurred recently in *Frederick Classical*—the process could drag on for years before the Charter School Operators could obtain a final decision as to the appropriate commensurate funding for the 2015-16 school year, from which it could then move to reopen its breach of contract action. Therefore, under the persuasive authority stated in *Occidental Chemical Corp.*, 810 F.3d 299 (5th Cir. 2016), the Stay Order would most likely place the Charter School Operators out of court for a protracted and indefinite period and is akin to a final judgment.

In sum, we conclude that: appellate review of the Stay Order would not result in piecemeal appeals or undermine judicial efficiency; the Stay Order is unclear as to what issues need to be resolved by the State Board, and how and when the Charter School Operators would be able to resume proceedings in the circuit court; and there is a substantial likelihood that the Stay Order will result in the Charter School Operators being effectively out of court for a prolonged and indefinite period. For those reasons, we hold that the Stay Order is an appealable final judgment under these narrow circumstances.

### B. Whether the Stay Order is an Abuse of Discretion

As we have held that the Stay Order is a final and appealable judgment, the issue of whether the circuit court's issuance of the Stay Order was an abuse of its discretion is

53

properly before us. For the following reasons, we conclude that the Stay Order was an abuse of discretion.

Judge Nance interrupted counsel during the motions hearing as to the counterclaims filed by the City Board to raise *sua sponte* the issue of whether the Charter School Operators' complaints were properly before the circuit court, instructing counsel to "[t]ell me what happened that causes you to rightfully be in my courtroom." Then, after a brief recess, Judge Nance invited the City Board's counsel to make an oral motion to dismiss the complaints. During subsequent oral arguments as to that motion to dismiss, the City Board argued that the issue of commensurate funding must be referred to the State Board under the doctrine of primary jurisdiction. Judge Nance seems to have agreed with the City Board, stating "[the Charter School Operators] have a duty to seek administrative review of a local [school] board and if not [then the State] Board." Ultimately, Judge Nance entered the Stay Order "in lieu of" granting the motion to dismiss.

Initially, contrary to Judge Nance's statements, the Charter School Operators were not required to seek administrative review before the City Board or State Board prior to filing their breach of contract action before the circuit court, and appear to have had a good reason for not doing so. The Charter School Operators allege that they could not have appealed to the City Board the proposed charter school funding allocation for the 2015-16 school year that they received from the Baltimore School System staff. If we assume that the Charter Operators are correct, without deciding that issue, then the only available path to bring their dispute before the State Board would be to file a petition for declaratory review before the State Board. However, there is no statutory or regulatory basis for the

54

State Board to award damages in a declaratory ruling. COMAR 13A.01.05.05 *et seq.*[34]

And, as the Charter School Operators correctly point out, prior declaratory rulings in which the State Board decided that local school boards failed to provide commensurate funding to charter schools resulted in those charter schools not receiving reimbursement from their local school boards. Thus, the Charter School Operators logically decided to instead first bring a breach of contract action in circuit court, which would permit them to potentially recover monetary damages from the City Board.

Moreover, as to primary jurisdiction, Judge Rubin had previously issued a ruling denying the City Board's first motion to dismiss the complaints on that ground. The parties' extensively briefed the issue of primary jurisdiction in written motions and memoranda for that motion to dismiss, and Judge Rubin held a hearing in which she heard extensive oral arguments from counsel regarding whether the commensurate funding issue must be first decided by the State Board. Judge Rubin denied the motion, based in part on her finding that the State Board had provided sufficient guidance as to how to determine whether a charter school was receiving commensurate funding that the issue did not need to be brought first before the State Board under primary jurisdiction. Although counsel for the City Board informed Judge Nance of the prior ruling by Judge Rubin, there is no clear

---

[34] We held in *Frederick Classical* that if the State Board ultimately decides that a local school board failed to provide a charter school commensurate funding for a given school year, the State Board should issue an order "calculating the exact amount of additional funds owed . . . and directing the local school board to pay that amount." 454 Md. at 422. However, that ruling was limited to an ED § 4-205 appeal from a local school board decision, which is distinct from a declaratory petition filed directly before the State Board.

indication in the record that Judge Nance reviewed that ruling prior to issuing the Stay Order.

A circuit court judge is not necessarily bound to respect an earlier legal ruling in a given case made by a fellow circuit court judge in the same way that a circuit court judge must respect a legal ruling in a given case by an appellate court under the doctrine of the law of the case. *See e.g.*, *Elec. Gen. Corp. v. Labonte*, 454 Md. 113, 140 (2017) ("The doctrine of the law of the case typically does not apply to a decision of a trial court because, 'as a general principle, one judge of a trial court ruling on a matter is not bound by the prior ruling in the same case by another judge of the court.'") (quoting *Scott v. State*, 379 Md. 170, 184 (2004)). However, it is concerning for a trial judge to effectively reverse a prior ruling made by another judge of the same court in the same case without even acknowledging that he is doing so, and without any indication in the record that he had reviewed and considered the earlier decision of his colleague.

The reversal in this case is particularly concerning because important arguments were raised during the course of proceedings on the first motion to dismiss the complaints before Judge Rubin. Specifically, the Charter School Operators argued against the imposition of an immediate stay in both their written response to the City Board's first motion to dismiss and during oral arguments as to that motion before Judge Rubin. They contended that if the circuit court felt that the case must first proceed before the State Board under the doctrine of primary jurisdiction, the court should allow the case to proceed through discovery before the circuit court. And, during oral arguments before Judge Rubin, they argued that if a stay was issued the court should provide "very specific instructions as

to what exactly the State Board would need to accomplish or could accomplish on any proceeding that would be appropriate," and also explain how to "bring this [matter] back to [the circuit court] for actual resolution and remedies."

However, unlike in the first motion to dismiss, the City Board did not request a stay as an alternative to a dismissal in the oral motion to dismiss before Judge Nance. Instead, Judge Nance ordered that the circuit court proceedings be stayed *sua sponte* at the very end of the hearing "in lieu of" granting the motion to dismiss. Thus, during the hearing before Judge Nance, the Charter School Operators had no reason to offer, and did not offer, similar arguments against an immediate stay.

Despite the arguments raised before Judge Rubin that a stay order needed detailed instructions, the Stay Order did not clearly state which issues needed to be resolved before the State Board and how the Charter School Operators could bring the case back and resume proceedings before the circuit court.[35] Furthermore, the Stay Order immediately stayed all proceedings before the circuit court, thereby precluding the Charter School Operators from conducting any further discovery before the circuit court. As noted above, without the opportunity to conduct additional discovery as to the City Board's finances and funding formula, the Charter School Operators may be unable to successfully bring any of

---

[35] In *TON Servs., Inc. v. Qwest Corp.*, the Tenth Circuit found that an order transferring a case under primary jurisdiction should be specific, or otherwise it is an abuse of discretion. 493 F.3d 1225, 1238-41 (10th Cir. 2007) (finding that the district court abused its discretion due to the court "misidentifying the issues to be referred and failing to clearly direct its primary jurisdiction referral . . . .").

the issues in their case before the State Board through the only procedural mechanism available to them at this juncture, a petition for declaratory ruling.

In summary, the Stay Order reversed the prior decision of Judge Rubin without any indication that Judge Nance had reviewed the earlier proceedings and decision before Judge Rubin. And, during the proceedings before Judge Rubin, the Charter School Operators raised cogent arguments against a stay, pointing out the importance of conducting discovery in circuit court in order to be able to successfully take the case before the State Board, as well as the need for clear instructions as to which issues needed to be resolved by the State Board. However, Judge Nance imposed the Stay Order *sua sponte*, and there is no indication that he was aware of or addressed the concerns regarding the open-ended and unclear stay. For these reasons, we hold that Judge Nance's decision to impose the Stay Order was an abuse of discretion, and we shall vacate the Stay Order.

Our holding today does not suggest that in every instance where a party files an action in circuit court that could also have been brought before an administrative agency, that party is entitled to discovery in circuit court before a stay may be issued under the doctrine of primary jurisdiction. Instead, we hold only that discovery must be permitted to proceed before the circuit court under the unique circumstances of this case.

Here, the Charter School Operators have a Contract with the City Board, under which the City Board was required to provide the Charter School Operators with detailed information as to its finances and charter school funding formula. The Charter School Operators, however, allege that the City Board has failed to provide them with such information for the 2015-16 school year. And, in the absence of discovery as to the City

Board's finances and charter school funding formula, the Charter School Operators may not be able to successfully bring any issue in the case before the State Board. Further, even if they were able to bring some or all of the issues in the case before the State Board, they may not be able to conduct any further discovery or fact-finding before the State Board.

In many other situations, when a party does not have a contractual or other right to obtain information from a state agency, or when there is a clear administrative process available for a party to obtain an administrative ruling or resolution, it would likely be appropriate for a court to stay a case under the doctrine of primary jurisdiction prior to permitting the case to proceed to discovery.

### C. Primary Jurisdiction Before the State Board

As we have held that the Stay Order was an abuse of discretion because of its vague and open-ended nature, and because it occurred prior to the conclusion of discovery before the circuit court, we shall remand the case to the circuit court. However, once discovery is concluded on remand, the circuit court will once again be confronted with the question of whether a new, more specific stay order must be entered under the doctrine of primary jurisdiction to permit the State Board to review whether the City Board's proposed charter school allocation was commensurate funding. Therefore, in order to provide guidance to the parties and the circuit court on remand, we shall also address whether the State Board must decide the commensurate funding issue under the doctrine of primary jurisdiction. *See* Md. Rule 8-131(a).

Under the doctrine of primary jurisdiction, the only question before the court is whether an issue in the case must first be resolved by an agency "which, under a regulatory

59

scheme, [has] been placed within the special competence of an administrative body[.]" *Arroyo*, 381 Md. 646, 658 (2004) (quoting *Western Pacific R.R. Co.*, 352 U.S. at 63-64). Unless the legislature expressly states that the remedy before the agency is exclusive, courts must make this determination. *Zappone v. Liberty Life Ins. Co.*, 349 Md. 45, 63 (1998). Courts have no fixed approach for deciding this but apply a presumption that the administrative remedy is primary. *Id.* at 63-65.

Here, there is no legislative statement regarding whether claims that a local school board failed to provide a charter school with commensurate funding must be brought before the State Board. But, the presumption applies with heightened force because the State Board has such a comprehensive role in setting educational policy, the State Board has "visitatorial" power, and because the State Board has a "paramount role" in "interpreting the public education law." *Balt. City Bd. of Sch. Comm'rs v. City Neighbors Charter Sch.*, 400 Md. 324, 344, 355 (2007).

An instructive case for resolving whether the State Board has primary jurisdiction over the underlying commensurate funding issue is *Board of Education for Dorchester County v. Hubbard*, 305 Md. 774, 777 (1986). In that case, two groups of public school teachers brought actions against local school boards, with one group raising grievances due to their teaching certificates being downgraded, while the other group requesting that a local school board provide an additional kindergarten teacher for their school. *Id.* at 780, 782-85. Both groups sought to bring their disputes to binding arbitration, as required in collective bargaining agreement entered into between their unions and the local school boards. *Id.* at 780, 782-83. The local school boards refused to enter into binding

60

arbitration, and filed a complaint before the circuit court, requesting declaratory judgment and an order staying arbitration. *Id.* at 780, 782-84.

Before the circuit court, the local school boards argued that under the controlling statute, any review of a decision by a county superintendent and county board was specifically reserved for the State Board of Education and was not delegable to an arbitrator. *Id.* at 781, 784. The circuit court in the first appeal disagreed and denied the county board's requests for relief, finding that "[u]nder the facts of these cases, respondents have the election at this point to proceed either through the appeal process contemplated by Code . . . § 4-205, or through arbitration under the applicable provisions of the Negotiated Agreement." *Id.* at 782 (emphasis in original). In the other appeal, the circuit court found that the group's grievance was arbitrable, and the arbitrator then held that the county board must remedy the situation. *Id.* The county boards then appealed and the groups' appeals were consolidated. *Id.* at 784-85.

On appeal, this Court considered whether "courts [should] defer to the State Board of Education under principles of primary jurisdiction, at least until the State Board authoritatively decides whether the classification of teacher's certificates and class size are subject to collective bargaining and arbitration." *Id.* at 785. After examining Maryland case law regarding primary jurisdiction, the Court held that "circuit courts were authorized to entertain actions to stay arbitration or to vacate arbitration awards," but that "ultimately the State Board of Education had primary jurisdiction over the question whether teacher's certificate and class size matters could, under the Education Article of the Code, be made the subject of collective bargaining and arbitration." *Id.* at 787. The Court then analyzed

61

ED §§ 2-205 and 4-205, which the Court found "expressly commit" decisions as to the classification of teacher's certificates and the size of classes to the jurisdiction of the State Board of Education. *Id.* at 790. The Court held that once "statutory interpretation questions have been resolved through the administrative and judicial review process," a party "would have an election of remedies." *Id.* at 792.

The specific election of remedies at issue in *Hubbard* was whether a teacher should bring a wage dispute before the State Board under ED § 4-205 or ED § 2-205, or whether to bring the matter before arbitration. *Id.* at 782. In its brief and at oral argument, the City Board attempted to distinguish the case on that point. However, in *Hubbard* the election of either State Board review or arbitration was due to the contract the teachers had signed which provided for binding arbitration. *Id.* at 782. In the present matter, the Contract between the parties has no binding arbitration clause, and the election of remedies is between State Board review and a breach of contract claim in circuit court.

In her ruling, Judge Rubin took the view that the history of declaratory rulings and adjudications issued by the State Board regarding charter school commensurate funding has effectively "resolved" the statutory interpretation issues for commensurate funding and provided courts with sufficient guidance for courts to resolve the issue. However, in *Frederick Classical*, we held that the State Board has not provided a formal rule for charter school commensurate funding, and instead has stuck solely to a case-by-case adjudicatory approach. 454 Md. 330, 410 (2017). And, we held that the State Board could change its commensurate funding formula, although it would have to give a detailed reason for doing so that accounts for charter schools' reliance interests and comports with the controlling

62

statute. *Id*. at 411-12. Additionally, we note that the City Board contends that there are several parts of its current funding formula that have not been previously ruled on or resolved by the State Board in earlier commensurate funding decisions. Therefore, following the analysis in *Hubbard*, the statutory interpretation issues have not been finally resolved through regulation, and the State Board should resolve the level of funding "commensurate" for the school year in question under the doctrine primary jurisdiction.

Judge Rubin, during the January 8, 2016 hearing on the City Board's motion to dismiss, stated "that every single time a charter school takes issue or challenges that proper commensurate funding has been placed, . . . the State Board of Education will always be entitled to make that a moving target." We agree with Judge Rubin's sentiment and note that the State Board still has not provided a clear rule defining "commensurate funding" even though it has been more than a decade since this Court's *City Neighbors* decision. If the State Board were to issue clear regulations regarding commensurate funding, the possibility for disputes between charter schools and local school boards would diminish.

Furthermore, although the Charter School Operators were at significant risk of being left in limbo and unable to return to the circuit court under the vague and open-ended Stay Order entered prior to the conclusion of discovery, the commensurate funding issue could easily be referred to the State Board without incurring that risk if the defects in the Stay Order were rectified. Thus, once discovery has concluded, or the circuit court determines that the Charter School Operators have obtained the financial and related information in discovery necessary to fairly present the commensurate funding dispute before the State

Board, it would be appropriate to stay proceedings to permit the parties to obtain a declaratory ruling from the State Board.

The Charter School Operators cite to *Baltimore City Board of School Commissioners v. Koba Institute, Inc.*, 194 Md. App. 400 (2010) and *County Board of Education v. Cearfoss*, 165 Md. 178 (1933) in support of their position. Charter School Operators argue that the present matter does not need to be referred to the State Board regarding the commensurate funding. The *Koba* court did hold that there are well-defined limits as to State Board review. 194 Md. App. at 417. But, in *Koba*, the State Board refused to intervene in the dispute, whereas, here, the State Board has not. *Id.* at 407 n.8. And unlike the present matter, *Koba* did not involve an ambiguous statute replete with policy determinations, did not use the words "primary jurisdiction," and the case's only discussion about primary jurisdiction came after the *Koba* court found in favor of the local board on sovereign immunity grounds. *Id.* at 417.[36] As for *Cearfoss*, this Court held only that when a contract involves a provision of the Education Article, the administrative remedy may not be so exclusive as to foreclose judicial review. 165 Md. at 178. This holding does not conflict with the present matter. Here, Charter School Operators filed their contractual claim in circuit court, the claim clearly identifies a contractual breach involving the Education Article, and interpretation of the Education Article is specifically granted to the State Board via the General Assembly. After the State Board has made a

---

[36] We disapprove of the *Koba* court's holding that the interpretation of an arguably ambiguous educational statute in ED § 8-410 did not require State Board review. 194 Md. App. at 417.

determination on the interpretation of commensurate funding in ED § 9-109, assuming there is an appeal, the circuit court will have an opportunity to review the State Board's decision. As such, neither of these cases bolster Charter School Operators' argument that primary jurisdiction should not apply.[37]

In conclusion, we find the reasoning in *Hubbard* compelling as applied to the present matter and see no reason to apply the analysis of any other cases cited by the parties as to primary jurisdiction. In applying *Hubbard* to the case *sub judice*, the matter should be stayed to permit the State Board to decide whether the City Board's proposed per-pupil funding allocation to charter school for the 2015-16 school year was commensurate funding. Therefore, the circuit court should order the State Board to make a final ruling on commensurate funding pursuant to its primary jurisdiction as we explain in more detail in the conclusion.

## CONCLUSION

---

[37] The Charter School Operators also argue that the Court should utilize the *Zappone* test to analyze whether concurrent or primary jurisdiction should apply. *See Zappone v. Liberty Life Ins. Co.*, 349 Md. 45, 64-66 (1998). The factors examined are: (1) the comprehensiveness of the administrative remedy in addressing an aggrieved party's claim; (2) the administrative agency's view of its jurisdiction over the matter; (3) the claim's dependence upon the statutory scheme; and (4) the claim's dependence upon the administrative agency's expertise. *Id.* Charter School Operators' claim, especially pertaining to commensurate funding, is dependent upon the statutory scheme. Further, the State Board undoubtedly possessed an unparalleled level of competence and expertise due to its inherent duty to preside over "substantial educational policy" decisions and its "visitatorial" authority. Additionally, Charter School Operators concede in their brief that the *Zappone* factors have "not been applied to litigation concerning local boards of education." We find no reason to apply these factors to the present matter.

In summary, under the unique circumstances of this case, and in particular the likelihood that the Stay Order would put the Charter School Operators entirely out of court without a clear path forward to obtain an agency or judicial resolution of their breach of contract claims, we hold that the Stay Order was a final and appealable judgment because the factual disposition of this case fulfills the high standard necessary for a stay order to be final and appealable. Therefore we reverse the judgment of the Court of Special Appeals dismissing the appeal. Additionally, we hold that the circuit court abused its discretion in staying the breach of contract proceedings when no factual record had yet been developed through discovery that would enable the State Board to resolve that issue, and without providing guidance to the parties as to how and when the case could resume before the court. Lastly, we hold that the State Board has primary jurisdiction as whether the City Board's proposed per-pupil funding allocation to charter school for the 2015-16 school year was commensurate funding.

Therefore, we direct a remand to the Circuit Court for Baltimore City for the parties to complete discovery. Discovery should proceed so that the Charter School Operators may receive more information and, either when the circuit court decides it has the information it needs or discovery ends, a more detailed stay order would be appropriate. Following the new stay order, Charter School Operators could file a declaratory petition with the State Board within a reasonable period of time.[38] *See Maryland Reclamation*

---

[38] If the State Board declines the petition, the Charter School Operators can appeal from that denial to the circuit court, which could order the State Board to proceed. *See* Md. Rule 7-209.

*Assocs., Inc. v. Harford Cty., Maryland*, 382 Md. 348, 367 (2004); COMAR 13A.01.05.02. The City Board may also file along with that petition. *See* COMAR 13A.01.05.03. The State Board may then issue a declaratory order on commensurate funding pursuant to its primary jurisdiction. Presumably, one of the parties will appeal from the State Board's ruling to the circuit court. *See* COMAR 13A.01.05.11. That appeal should be consolidated with the breach of contract action. Then, the circuit court may proceed to review the State Board decision under the more deferential substantial evidence standard of review for agency decisions. *See* Md. Rule 7-201. Afterwards, the circuit court may resume proceedings on the breach of contract actions, applying the State Board decision.

Until the State Board issues clear regulations on charter school funding instead of relying on the 10-year-old *City Neighbors* declaratory rulings, the fiscal calculations regarding commensurate funding for charter schools will remain, as Judge Rubin stated, a "moving target."

**JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED; CASE REMANDED TO THAT COURT WITH DIRECTIONS TO REMAND THE CASE TO THE CIRCUIT COURT, AND UPON REMAND TO THE CIRCUIT COURT, WITH ADDITIONAL DIRECTIONS TO THAT COURT TO VACATE THE STAY ORDER AND FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS IN THIS COURT AND THE COURT OF SPECIAL APPEALS TO BE PAID BY RESPONDENT.**

Circuit Court for Baltimore City
Case No. 24-C-15-005507

Argued: September 11, 2017

IN THE COURT OF APPEALS

OF MARYLAND

No. 7

September Term, 2017

_____

MONARCH ACADEMY BALTIMORE
CAMPUS, INC., ET AL.

v.

BALTIMORE CITY BOARD OF SCHOOL
COMMISSIONERS

_____

Barbera, C.J.
Greene
Adkins
McDonald
Watts
Hotten
Getty,

JJ.

_____

Concurring and Dissenting Opinion by Watts,
J., which Greene and Hotten, JJ., join.

_____

Filed: December 18, 2017

Respectfully, I concur in part and dissent in part. I agree with the Majority that the Maryland State Board of Education ("the State Board") has primary jurisdiction over the underlying commensurate funding issues. See Maj. Slip Op. at 5, 63-64, 66. I part ways with the Majority, however, as to the issue of whether the stay order issued by the Circuit Court for Baltimore City ("the circuit court") is an appealable order. Unlike the Majority, I would conclude that the stay order is not appealable because it is neither a final judgment nor an order appealable under the collateral order doctrine. As such, I would have affirmed the judgment of the Court of Special Appeals. Before explaining my reasons, it is helpful to set forth some of the relevant factual and procedural background of the case, as well as relevant law.

This case arises from complaints filed in the circuit court by various charter schools in Baltimore City ("the Charter Schools"), Petitioners, against the Baltimore City Board of School Commissioners ("the City Board"), Respondent, alleging that the City Board breached contracts by failing to provide funding to the Charter Schools that was commensurate with the amount disbursed to other public schools and by failing to provide budget and financial information. Among other things, in the complaints, the Charter Schools alleged that the City Board had "never provided 'commensurate funding'" as required by Md. Code Ann., Educ. (1978, 2014 Repl. Vol., 2016 Supp.) ("ED") § 9-109, and had instead, "from year to year, arbitrarily presented charter school operators with take-it-or-leave-it charter school per pupil figures derived from using varying (or no) calculation methodology, inflated estimates of overall System enrollment, and unsupported and dubious financial and budget figures." And, according to the Charter Schools, the City

Board had "failed to apply the per pupil calculation methodology put forth by the [] State Board [] and affirmed by the Court of Appeals." In addition, the Charter Schools alleged that the City Board had "unilaterally changed [its] methodology in developing the amount to be disbursed to charter schools." The cases were later consolidated.

The City Board filed motions to dismiss, or in the alternative, to stay and memoranda in support, contending that the complaints should be dismissed for failure to state a claim upon which relief could be granted and for lack of primary jurisdiction. Alternatively, the City Board sought to stay the cases "pending a ruling" from the State Board. Specifically, among other things, the City Board argued that the "gravamen" of the complaints—that the City Board failed to provide commensurate funding for charter school students—was "a matter that should be decided" in the first instance by the State Board, not the circuit court, pursuant to the primary jurisdiction doctrine. In the memoranda accompanying the motions, the City Board alleged that, on November 9, 2015, it filed with the State Board a petition for declaratory relief seeking a ruling that it has provided commensurate funding to the Charter Schools and "that the funding formula has been properly applied."

The Charter Schools filed oppositions to the motions to the dismiss or stay, contending that the circuit court, not the State Board, "has proper jurisdiction over th[e] breach of contract action[s]." As to the City Board's alternative request for a stay, the Charter Schools contended that the request should be denied because the City Board's petition to the State Board did not seek or implicate "interpretation of the 'true intent and meaning' of education law[,]" but rather sought "to apply the education law, as already

explained and interpreted, and incorporated into a contract, to a specific set of circumstances." Additionally, the Charter Schools argued that, because the State Board was not required to issue a declaratory ruling, granting the motions to stay could result in the Charter Schools being "left indefinitely without any result[.]"

On January 8, 2016, the circuit court conducted a hearing on the motions to dismiss or stay, and, at the conclusion of the hearing, the circuit court denied the motion to dismiss or stay, orally ruling from the bench. The circuit court determined that <u>Balt. City Bd. of Sch. Comm'rs v. City Neighbors Charter Sch.</u>, 400 Md. 324, 929 A.2d 113 (2007) "provided sufficient guidance" as to the meaning of "commensurate funding," including the "requisite factors to be considered, [and] the data to be considered." Under such circumstances, the circuit court concluded that it was "no longer obliged to punt the issue to the expertise of the" State Board "because there has been sufficient guidance through" the State Board's prior decisions on the issue of the meaning of "commensurate funding."

On January 27, 2016, the City Board filed answers and affirmative defenses to the various complaints.

Meanwhile, on February 23, 2016, the State Board issued an opinion dismissing the City Board's petition for declaratory ruling without prejudice. Specifically, the State Board determined as follows:

> The arguments raised in the underlying dispute are not addressed herein. Rather, the issue here is whether the appeal should be stayed, dismissed, or proceed for review. Moreover, whether or not the [c]ircuit [c]ourt correctly ruled on the jurisdiction of the State Board is not an issue here. Even if the State Board has concurrent jurisdiction with the [c]ircuit [c]ourt over the issue raised, the [c]ircuit [c]ourt has already asserted its jurisdiction on the consolidated proceeding before it and has elected to move

- 3 -

forward rather than impose a stay.

> One of the central tenets of the legal process is the conservation of judicial (and quasi-judicial) resources. As we recognized when we stayed the State Board proceedings in [another case] while the corresponding court case proceed, "[i]nstituting a parallel and simultaneous proceeding here while the circuit court also hears this case would be contrary to that tenet." It is our view in this matter that it does not serve the interests of judicial economy to proceed further.

(Last alteration in original). The State Board also noted that the petition for declaratory ruling "fail[ed] to present any facts concerning the funding formula that [the City Board] actually used to fund the [C]harter [S]chools[,]" and, thus, failed to present "concrete facts from which [the State Board] could declare the law."

Also on February 23, 2016, the City Board filed counterclaims against the Charter Schools. On March 17, 2016, the Charter Schools filed a motion to dismiss the counterclaims. On April 4, 2016, the City Board filed an opposition to the motion to dismiss the counterclaims. And, on April 13, 2016, the Charter Schools filed a reply in support of the motion to dismiss the counterclaims.

On April 18, 2016, the circuit court conducted a hearing on the motion to dismiss the counterclaims.[1] During the hearing, the circuit court asked whether an administrative proceeding was pending and requested that the parties tell the court "what happened that causes you to rightfully be in [the] courtroom." The City Board's counsel responded as follows:

> I wish I was in front of you several months ago. I think in January we had a

---

[1]The April 18, 2016 hearing was conducted by a different judge of the circuit court, and not the judge that had conducted and ruled at the January 8, 2016 hearing on the City Board's motions to dismiss or stay.

> hearing on a motion to dismiss where we argued exactly what Your honor is stating, the doctrine of primary jurisdiction that this case should be stayed in favor of the State Board [] making a determination of these issues and our motion was denied.

After additional discussion about the procedural history of the case, the circuit court took a brief recess.

After the recess, the circuit court stated that it understood that the City Board wanted to make an oral motion. At that point, the City Board's counsel moved to dismiss the case "on the basis that the appropriate tribunal or court or body to hear th[e] matter is the State Board[.]" Relying on City Neighbors, 400 Md. 324, 929 A.2d 113, the City Board's counsel argued that "case law is very clear that [the State Board] should be the first one to take up matters such as the ones that have been raised by the" Charter Schools "relating to intricate, detailed, and important issues of public policy relating to education and educational funding[.]" The Charter Schools' counsel responded that the claim raised in the complaint was for a breach of contract, and the resolution of such a claim is properly with the circuit court, not the State Board.

At the conclusion of the hearing, the circuit court granted the Charter Schools' motion to dismiss the counterclaims without prejudice. As to the City Board's oral motion to dismiss the complaints, the circuit court denied the motion to dismiss, but ruled that the case should be stayed "pending the matter be[ing] administratively reviewed before it comes to the [c]ircuit [c]ourt." Essentially, the circuit court found that the State Board had primary jurisdiction over the matter. The following day, April 19, 2016, the circuit court issued an order granting the motion to dismiss the counterclaims without prejudice,

denying the motion to dismiss the complaints without prejudice, and staying the consolidated case pending review by the State Board.

On May 5, 2016, the Charter Schools noted an appeal to the Court of Special Appeals seeking review of the circuit court's stay order.[2]  On July 15, 2016, the Charter Schools filed in the circuit court a motion to lift stay, and on August 2, 2016, the City Board filed an opposition to the motion to lift stay.  On August 18, 2016, the circuit court issued an order denying the motion to lift stay.

In the Court of Special Appeals, the City Board moved to dismiss the appeal on the ground that the stay order was not an appealable order.  See Monarch Academy Baltimore Campus, Inc. v. Baltimore City Bd. of Sch. Comm'rs, 231 Md. App. 594, 612 n.10, 153 A.3d 859, 870 n.10 (2017).  The Court of Special Appeals denied the motion to dismiss the appeal with leave to seek that relief in the City Board's appellee's brief.  Id. at 612 n.10, 153 A.3d at 870 n.10.  The City Board, however, did not include a motion to dismiss in its brief or otherwise request a ruling on whether the stay order was an appealable order, either

_____

[22]While the case was pending in the Court of Special Appeals, on May 31, 2016, the City Board filed with the State Board a second petition for declaratory ruling, alleging that it had provided, and continues to provide, "cash and services to all of its charter schools, including the Charter Schools, that amount to more than commensurate funding."  Thus, the City Board requested, among other things, a declaration that it had provided commensurate funding to the Charter Schools.  On June 3, 2016, the Charter Schools filed with the State Board an emergency motion to stay or, in the alternative, for an extension of time and additional relief, stating, in pertinent part,  that the circuit court case had been stayed and that they had appealed the stay order to the Court of Special Appeals.  On June 20, 2016, the State Board issued an order dismissing the City Board's second petition for declaratory ruling, explaining that, "because the case remains within the jurisdiction purview of the courts, the State Board declines to consider the Petition for Declaratory Ruling."

- 6 -

in its brief or at oral argument before the Court of Special Appeals. Id. at 612 n.10, 153 A.3d at 870 n.10. As such, after oral argument, in an order issued on December 15, 2016, the Court of Special Appeals requested that the parties file memoranda addressing whether the stay order was an appealable order and whether the State Board is required to issue a decision on a request for a declaratory ruling, and if not, whether the failure to do so would result in the Charter Schools "being placed effectively out of court." In its memorandum, the City Board contended that the stay order was not an appealable order, but asked that, "in the interest of judicial economy and jurisdictional clarity, the Court of Special Appeals rule on the merits and hold that the State Board had primary jurisdiction over the matter. Id. at 612 n.10, 153 A.3d at 870 n.10.

On February 2, 2017, in a reported opinion, the Court of Special Appeals dismissed the appeal, concluding that the circuit court's stay order is not an appealable order. See Monarch Academy, 231 Md. App. at 600, 153 A.3d at 862. Specifically, the Court of Special Appeals determined that that the stay order is not a final judgment because it "did not conclude the rights of the parties or adjudicate all of the claims in the action[,]" and because it did not have the effect of putting the Charter Schools out of court. Id. at 613-14, 153 A.3d at 870-71. The Court of Special Appeals also concluded that the stay order is not appealable under the collateral order doctrine because the stay order did not resolve an issue separate from the merits of the action. See id. at 616, 153 A.3d at 872. The Court of Special Appeals stated that the determination of primary jurisdiction is "inextricably bound up with a determination of the merits of a case." Id. at 616, 153 A.3d at 872 (citation and internal quotation marks omitted). Because it concluded that the stay order was not

- 7 -

appealable as a final judgment or under the collateral order doctrine, the Court of Special Appeals dismissed the appeal and did not reach the merits of the primary jurisdiction issue. See id. at 619, 612, 153 A.3d at 874, 870.

Thereafter, the Charter Schools filed in this Court a petition for a writ of *certiorari*, which this Court granted. See Monarch Academy Baltimore Campus v. Baltimore City Bd. of Sch. Comm'rs, 452 Md. 523, 157 A.3d 809 (2017).

At the risk of stating the obvious, this Court must have appellate jurisdiction to consider the propriety of the circuit court's issuance of the stay order, *i.e.*, the stay order must be an appealable order. Here, relevant case law leads to the conclusion that the stay order is appealable neither as a final judgment nor under the collateral order doctrine. Indeed, "[w]here appellate jurisdiction is lacking, the appellate court will dismiss the appeal on its own motion." Schuele v. Case Handyman and Remodeling Servs., LLC, 412 Md. 555, 565, 989 A.2d 210, 215 (2010) (citation and internal quotation marks omitted); see also Md. R. 8-602(a)(1) ("On motion or on its own initiative, the Court may dismiss an appeal for any of the following reasons: (1) the appeal is not allowed by these rules or other law." (Paragraph break omitted)). As this Court noted in Schuele, 412 Md. at 565, 989 A.2d at 215, "[i]n Maryland, appellate jurisdiction, except as constitutionally granted, is statutorily granted." (Citations omitted). Generally speaking, "a trial court's decision on a motion for a postponement, continuance, or stay is ordinarily not appealable." Cty Comm'rs. of Frederick Cty. v. Schrodel, 320 Md. 202, 213, 577 A.2d 39, 45 (1990) (citation omitted). And, "[a]s a general rule, under Maryland law, litigants may appeal only from what is known as a 'final judgment.'" URS Corp. v. Fort Myer Constr. Corp.,

452 Md. 48, 65, 156 A.3d 753, 763 (2017) (quoting Md. Code Ann., Cts. & Jud. Proc. (1973, 2013 Repl. Vol.) ("CJ") § 12-301). CJ § 12-301 provides, in pertinent part: "Except as provided in [CJ] § 12-302 . . . , a party may appeal from a final judgment entered in a civil . . . case by a circuit court. The right of appeal exists from a final judgment entered by a court in the exercise of original, special, limited, statutory jurisdiction, unless in a particular case the right of appeal is expressly denied by law."

In Addison v. Lochearn Nursing Home, LLC, 411 Md. 251, 273-74, 983 A.2d 138, 151-52 (2009), this Court stated that "[t]here are limited exceptions to the final judgment rule[,]" and identified those exceptions as follows:

> We have made clear that the right to seek appellate review of a trial court's ruling ordinarily must await the entry of a final judgment that disposes of all claims against all parties, and that there are only three exceptions to that final judgment requirement: appeals from interlocutory orders specifically allowed by statute; immediate appeals permitted under Maryland Rule 2-602; and appeals from interlocutory rulings allowed under the common law collateral order doctrine.

(Citation and brackets omitted). As to appeals from interlocutory orders specifically allowed by statute, pursuant to CJ § 12-303, "[a] party may appeal from [certain] interlocutory orders entered by a circuit court in a civil case[.]" An order granting a stay of the case for administrative proceedings is not one of the interlocutory orders identified in CJ § 12-303. As to immediate appeals permitted under Maryland Rule 2-602, that Rule provides that, where an order is entered that does not dispose of the entire action, and thus is not a final judgment, the trial court may nonetheless "direct in the order the entry of a final judgment" if the trial court determines "that there is no just reason for delay[.]" In this case, in issuing the stay order, the circuit court did not direct the entry of a final

judgment. In other words, neither CJ § 12-303 nor Maryland Rule 2-602 is applicable in this case; as such, an examination of more detail as to whether the stay order constituted a final judgment or was appealable under the collateral order doctrine is needed.

Under the final judgment rule, "a final judgment exists only when the trial court intends an 'unqualified, final disposition of the matter of the controversy' that completely adjudicates all claims against all parties in the suit, and only when the trial court has followed certain procedural steps when entering a judgment in the record." URS Corp., 452 Md. At 65, 156 A.3d at 763 (citation omitted). This Court has further explained:

> Generally, to constitute a final judgment, a trial court's rulings must either decide and conclude the rights of the parties involved or deny a party the means to prosecute or defend rights and interests in the subject matter of the proceeding. Moreover, to be a final judgment in a controversy involving multiple claims, the order must dispose of all claims in the action. An order that is not a final judgment is an interlocutory order and ordinarily is not appealable.

Schuele, 412 Md. at 565, 989 A.2d at 216 (citations and brackets omitted). Recently, in Metro Maint. Sys. S., Inc. v. Milburn, 442 Md. 289, 298, 112 A.3d 429, 434 (2015), this Court described the three attributes that a ruling ordinarily must have to constitute a final judgment:

> (1) it must be intended by the court as an unqualified, final disposition of the matter in controversy, (2) unless the court acts pursuant to Maryland Rule 2-602(b) to direct the entry of a final judgment as to less than all of the claims or all of the parties, it must adjudicate or complete the adjudication of all claims against all parties, (3) it must be set forth and recorded in accordance with Rule 2-601.

(Citations omitted).

To constitute an unqualified, final disposition of the matter in controversy, "an order

- 10 -

of a circuit court must be so final as either to determine and conclude the rights involved or to deny the appellant the means of further prosecuting or defending his or her rights and interests in the subject matter of the proceeding." Id. at 299, 112 A.3d at 435 (citations, emphasis, and internal quotation marks omitted). This Court has stated, however, that "[a]n order need not resolve the merits of a case . . . to constitute a final judgment[,]" explaining:

> Even if the order does not decide and conclude the rights of the parties, it nevertheless will be a final judgment if it terminates the proceedings in that court and denies a party the ability to further prosecute or defend the party's rights concerning the subject matter of the proceeding. Such an order has been described as one that has the effect of putting the party out of court.

Id. at 299, 112 A.3d at 435 (citations, brackets, and internal quotation marks omitted). Importantly, "in determining whether an order that terminates proceedings in a particular court can be said to 'put that party out of court' the key question is whether the order contemplates that the parties will no longer litigate their rights in that court." Id. at 299, 112 A.3d at 435 (citations omitted). And, "[t]he order need only have the effect of terminating the proceedings in a particular court; the availability of another forum in which the parties may litigate their dispute is irrelevant to finality." Id. at 300, 112 A.3d at 435-36 (citations omitted).

As to the procedural steps required for entry of a final judgment, "[o]ne of the procedural steps for entry of final judgment—the 'separate document requirement'— requires the trial court to memorialize the judgment in a separate document that is signed by either the court clerk or the judge and entered in the docket." URS Corp., 452 Md. at 65-66, 156 A.2d at 763 (citations omitted). As one example of an order that constitutes a final judgment, this Court has concluded "that an order compelling arbitration of a

controversy is immediately appealable as a final judgment even though it does not finally dispose of all claims in the action in which it was filed because the order has the effect of putting the parties out of court." Schuele, 412 Md. at 571, 989 A.2d at 219 (citation and internal quotation marks omitted). In contrast, this Court has determined "that a trial court's order denying a challenge to its jurisdiction is a nonappealable interlocutory order because the order does not settle or conclude the rights of any party or deny him the means of proceeding further." Id. at 571, 989 A.2d at 219 (citation and internal quotation marks omitted).

In Carter v. Huntington Title & Escrow, LLC, 420 Md. 605, 608-09, 24 A.3d 722, 723 (2011), this Court considered an "appeal from a judgment" of a trial court and held that the Maryland Insurance Administration ("the MIA") "possesse[d] primary jurisdiction over [the plaintiff]'s claim," such that the plaintiff "must seek relief initially through the administrative adjudication process." In Carter, id. at 609-10, 24 A.3d at 724-25, a plaintiff filed in the trial court a complaint against a title insurance company alleging that the title insurance company violated various statutes by applying to his refinance closing a more costly original issue rate for the lender's policy rather than a reduced policy reissue rate mandated by the MIA. Specifically, the plaintiff alleged that Maryland statutes and regulations required the title insurance company "to receive approval of rate schedules, not to deviate from those rates once approved, and to award customers the best possible price for which they qualify." Id. at 612, 24 A.3d at 726 (citations omitted). The title insurance company filed a motion to dismiss, arguing that the MIA, not the trial court, had primary jurisdiction over the plaintiff's claim. See id. at 613, 24 A.3d at 726. The trial court granted

- 12 -

the motion to dismiss in a written order. See id. at 614, 24 A.3d at 727. The plaintiff appealed to the Court of Special Appeals, but before that court considered the case, this Court granted a writ of certiorari. See id. at 614, 24 A.3d at 727.

On review, this Court discussed in detail the reasons why the MIA had primary jurisdiction over the plaintiff's claim. See id. at 627-35, 24 A.3d at 734-39. We also rejected the plaintiff's contention that, even if the MIA had primary jurisdiction, he should not be required to go through the administrative process "because the relief afforded in the Insurance Article is inadequate for any consumer, but especially him." Id. at 635, 24 A.3d at 739. This Court explained, in part, that "the fact that an administrative remedy may be inadequate is considered usually an exception to exhaustion, but not necessarily primary jurisdiction[,]" i.e., the plaintiff would be required to exhaust administrative remedies before the MIA before proceeding in the trial court. Id. at 635, 24 A.3d at 739.

Then, in the final paragraph of the opinion, this Court considered whether the trial court "should relinquish jurisdiction by dismissing [the plaintiff]'s complaint or stay th[e] case pending the outcome of any administrative proceeding." Id. at 637, 24 A.3d at 741. This Court concluded that the trial court should have stayed the case rather than dismissing it, explaining:

> In *Arroyo v. Board of Education of Howard County*, 381 Md. 646, 650 n. 5, 851 A.2d 576, 579 n. 5 (2004), we reviewed a series of cases involving primary jurisdiction and indicated ultimately that "the primary jurisdiction of an agency . . . does not actually prohibit the filing of an independent judicial action, only its adjudication prior to the exhaustion of the administration remedy." *See also Converge Servs. Group*, 383 Md. at 480, 860 A.2d at 881 ("[T]he court may stay its consideration of the invoked judicial remedy and await the result of the administrative proceedings before addressing the appropriateness of the relief sought in the litigation."

(citations omitted)); *Maryland-National Capital Park & Planning Comm'n v. Crawford*, 307 Md. 1, 18, 511 A.2d 1079, 1087-88 (1986) ("[I]n situations like that in the present case . . . where the administrative agency may have primary jurisdiction, and where the plaintiff invokes the judicial remedy prior to exhausting the administrative procedures, it has been held that the trial court may retain jurisdiction pending exhaustion of the administrative procedures." (citations omitted)). Therefore, we conclude that, although [the plaintiff] did not file an administrative complaint, he was not foreclosed from filing the present judicial action, only that he could not pursue it to a conclusion at this time. The [trial c]ourt should stay further proceedings regarding the judicial complaint until the outcome of the administrative adjudication. If [the plaintiff] neglects to pursue administrative relief within a reasonable time, then his judicial claim may not progress and, in all likelihood, would be dismissed. *See* Maryland Rule 2-507 (authorizing dismissal for lack of prosecution).

Id. at 637-38, 24 A.3d at 741 (ellipses and some alterations in original).

The collateral order doctrine, on the other hand, "is based upon a judicially created fiction, under which certain interlocutory orders are considered to be final judgments, even though such orders clearly are *not* final judgments." Dawkins v. Baltimore City Police Dep't, 376 Md. 53, 64, 827 A.2d 115, 121 (2003) (emphasis in original). This Court has emphasized that the judicial fiction "is a perceived necessity, in a very few extraordinary situations, for immediate appellate review." Id. at 64, 827 A.2d at 121 (footnote, ellipsis, and internal quotation marks omitted); see also Schuele, 412 Md. at 572, 989 A.2d at 220 ("[W]e emphasized that [the collateral order] doctrine should be applied sparingly in only the most extraordinary circumstances."). In Washington Suburban Sanitary Comm'n v. Bowen, 410 Md. 287, 296, 978 A.2d 678, 684 (2009), this Court reiterated that the collateral order doctrine is a "very narrow exception" to the final judgment rule. We have explained that the collateral order doctrine

permits premature appeals from a limited class of cases in which the order

- 14 -

appealed does not adjudicate all claims against all parties but (1) conclusively determines the disputed question, (2) resolves an important issue, (3) resolves an issue that is completely separate from the merits of the action, *and* (4) would be effectively unreviewable if the appeal had to await the entry of a final judgment.

Schuele, 412 Md. at 572, 989 A.2d at 220 (emphasis in original) (citation and internal quotation marks omitted).  Significantly, "the four elements of the test are conjunctive in nature and in order to fall within this exception to the ordinary operation of the final judgment requirement, each of the four elements must be met."  Bowen, 410 Md. at 296, 978 A.2d at 684 (citation and ellipsis omitted).

In Schrodel, 320 Md. at 210, 214, 577 A.2d at 43, 45, this Court concluded that an order that had the effect of enjoining a county from proceeding with a condemnation action until the county obtained from the Maryland Department of the Environment a permit to construct a landfill on a certain property was appealable under the collateral order doctrine. In that case, this Court stated that the trial court's order, which set the trial date out for a period of eighteen months or later, "was not simply an order postponing the trial[,]" but instead "was an order staying the condemnation action until the [c]ounty obtained a permit to construct a landfill on the [] property." Id. at 211, 577 A.2d at 44.  In our view, the order satisfied all four requirements to be appealable under the collateral order doctrine. See id. at 211, 577 A.2d at 44.  This Court explained, in pertinent part:

> First, the order conclusively determined that the [c]ounty must wait until it receives a permit from the Maryland Department of the Environment before it can go to trial with its condemnation action.  Second, the issue of whether a court can lawfully impose such a condition on the government's power to acquire property by condemnation is clearly important.  Many essential public projects begin with a taking of land and require various permits before completion.

- 15 -

Third, the question of whether the [c]ounty can be required to obtain the permit before having a trial is obviously distinct from the trial itself. . . . The court's [] order . . . is unrelated to the issues to be litigated at the trial. it is an order that there will be no trial until the permit is actually procured.

Fourth, if not appealable until the trial's conclusion, the claim that the [c]ounty's right to condemn cannot be conditioned on first obtaining all necessary permits would be irretrievably lost. . . . If the [c]ounty were to get the permit, it would take the property after a trial on value only, and the issue of whether the court could impose the condition would be moot on appeal. Meanwhile, the [c]ounty, having gone through an expensive and time-consuming permit process, would be in a position where it would be difficult to exercise its right to abandon the taking if it considered the jury award to be unreasonably high. Moreover, the [c]ounty would have to wait until it gets the permit to begin preparing the property for a landfill. If it had the property now, it could begin that work today.

Id. at 212-13, 577 A.2d at 44-45 (citation omitted). This Court further explained that the

trial court's order was "no ordinary postponement of the trial":

Not only is the length at least eighteen months, but it is certain that there will never be a trial if the [c]ounty fails to obtain the permit. The order in this case assures that if the [c]ounty does get the permit, only then can it prepare the property as a landfill. An important government prerogative has been delayed or defeated because of an allegedly unlawful condition. The vast majority of postponement orders, in contrast, merely require a party to wait longer for trial.

Id. at 214, 577 A.2d at 45. Accordingly, this Court determined that the trial court's order

was appealable under the collateral order doctrine, but we "emphasized . . . that this is a

case where our holding concerning appealability goes no further than the circumstances

presented in th[e] case." Id. at 214, 577 A.2d at 45 (citation and internal quotation marks

omitted).

Based on the case law set forth above, I would conclude that the stay order is not

appealable because it is neither a final judgment nor an order appealable under the collateral

order doctrine. I would begin by examining whether the stay order constitutes a final judgment, and would determine that it does not. Significantly, the stay order does not "decide and conclude the rights of the parties involved or deny a party the means to prosecute or defend rights and interests in the subject matter of the proceeding." Schuele, 412 Md. at 565, 989 A.2d at 216 (citation and internal quotation marks omitted); see also Milburn, 442 Md. at 299, 112 A.3d at 435. Indeed, the stay order does not decide and conclude the rights of the parties involved because it is not a ruling on or resolution of the merits of the breach of contract claim, *i.e.*, the stay order did not "decide" or "conclude" the rights of the parties vis-à-vis the breach of contract claim.

Nevertheless, order does not need to resolve the merits of a case to constitute a final judgment where the order denies a party the means to prosecute or defend rights and interests in the subject matter of the proceeding and, thus, "has the effect of putting the party out of court." Milburn, 442 Md. at 299, 112 A.3d at 435 (citation, brackets, and internal quotation marks omitted). As stated, in determining whether an order has the effect of putting a party out of court, "the key question is whether the order contemplates that the parties will no longer litigate their rights in that court." Id. at 299, 112 A.3d at 435 (citations omitted). Here, the very language of the circuit court's oral ruling and the stay order demonstrates that the stay order does not contemplate that the parties will no longer litigate their rights in the circuit court. In denying the City Board's motion to dismiss, the circuit court ruled that the case should be stayed "pending the matter be[ing] administratively reviewed before it comes to the [c]ircuit [c]ourt." And, the stay order itself states, in pertinent part, "that the above-captioned consolidated action, and all actions

contained and consolidated therein, hereby are **STAYED** pending administrative review of the parties' dispute by the State Board[.]" (Emphasis in original). Simply put, the stay order clearly contemplates that the parties will litigate their rights in the circuit court after the State Board conducts its administrative review. Stated otherwise, the stay order directs the parties to seek review first before the State Board concerning issues of commensurate funding prior to litigating the breach of contract claim in the circuit court; notably, the stay order does not state or even contemplate that the parties are prohibited from litigation in the circuit court altogether. And, the stay order did not terminate the proceedings in the circuit court; rather, the stay order is in the nature of a postponement, not an order that has the effect of putting the Charter Schools out of court. See Milburn, 442 Md. at 300, 112 A.3d at 435-36 ("The order need only have the effect of terminating the proceedings in a particular court; the availability of another forum in which the parties may litigate their dispute is irrelevant to finality." (Citations omitted)). Moreover, the stay order does not send the Charter Schools to a different court and thus terminate the proceedings in the circuit court, but rather the stay order places the case on hold pending review by the State Board of the statutory issue.

The Charter Schools' reliance on Carter for the proposition that the stay order is the equivalent of a dismissal, and, thus, constitutes a final judgment that is immediately appealable is not persuasive. Initially, I do not agree, as a general matter, that a dismissal and a stay are the same and that both are final and immediately appealable. To be sure, there may be circumstances where a stay order, perhaps indefinite in nature, can constitute a final judgment. For example, an order staying proceedings and compelling arbitration

"is immediately appealable as a final judgment even though it does not finally dispose of all claims in the action in which it was filed because the order has the effect of putting the parties out of court." Schuele, 412 Md. at 571, 989 A.2d at 219 (citation and internal quotation marks omitted). But, as I would determine, the stay order in this case does not have the effect of putting the parties out of court and, as such, is distinct from an order dismissing a case, as was the case in Carter.

Indeed, in Carter, 420 Md. at 608-09, 613, 24 A.3d at 723, 726, this Court was clear that the case involved an "appeal from a judgment" of a trial court in which the trial court had granted a motion to dismiss, ruling that the MIA had primary jurisdiction over the plaintiff's claim, *i.e.,* administrative proceedings needed to occur first. In the final paragraph of Carter, id. at 637-38, 24 A.3d at 741, in considering whether the trial court should dismiss a complaint or stay a case pending the outcome of administrative proceedings where an administrative agency has primary jurisdiction, this Court concluded that the trial court should have stayed the case rather than dismiss the case, explaining, in pertinent part, that "the primary jurisdiction of an agency does not actually prohibit the filing of an independent judicial action, only its adjudication prior to the exhaustion of the administration remedy." In other words, in Carter, this Court endorsed the view that, where a trial court has ruled that an administrative agency has primary jurisdiction, the proper procedure for the trial court to follow is to stay the judicial proceedings to allow for administrative review first, after which time the parties may return to the trial court. That is exactly what happened in this case—the circuit court concluded that the State Board has primary jurisdiction and stayed the proceedings pending administrative review by the State

- 19 -

Board. This is so even if the parties have not filed an administrative complaint at the time the stay is issued. See Carter, id. at 638, 24 A.3d at 741 ("[W]e conclude that, although Carter did not file an administrative complaint, he was not foreclosed from filing the present judicial action, only that he could not pursue it to a conclusion at this time.").

That the State Board declined to weigh in on the commensurate funding issue while the case was pending in the circuit court and then the Court of Special Appeals is of no consequence because the State Board's reasoning is now inapplicable, *i.e.*, the court proceedings are on hold pending the State Board's administrative review. The State Board's order dismissing the City Board's second petition for declaratory ruling specifically explained that, "because the case remains within the jurisdiction purview of the courts, the State Board declines to consider the Petition for Declaratory Ruling." Now that the court proceedings are stayed and the appellate process concluded by virtue of this opinion, the State Board can begin administrative proceedings upon the filing of an administrative complaint, request for a declaratory ruling, or the like. Moreover, nothing in the record—aside from the Charter Schools' contention—indicates that the State Board will unduly delay in deciding the commensurate funding issue once the issue is properly presented to it. As such, I would determine that the stay order does not put the Charter Schools out of court; rather, the stay order simply postpones resolution of the breach of contract claim pending guidance from the State Board on the commensurate funding issue, which will inform the circuit court's decision with respect to the breach of contract claim. In short, the stay order does not end the litigation on the merits. Under these circumstances, I would conclude that the stay order is not a final judgment.

I likewise would conclude that the stay order does not fulfill the requirements of the collateral order doctrine and is not immediately appealable under the collateral order doctrine. As to whether the stay order conclusively determines the disputed question, I would conclude that the disputed question at the heart of the breach of contract claim— whether the City Board provided the Charter Schools with commensurate funding as required by ED § 9-109—is not conclusively determined by the stay order. Indeed, the stay order did not comment on, let alone conclusively determine or resolve, the merits of the breach of contract claim.

Additionally, I would determine that the stay order does not resolve an issue that is completely separate from the merits of the action. The issue of which entity has primary jurisdiction, the circuit court or the State Board, and, thus, which entity determines in the first instance the commensurate funding issue, is intrinsically tied to the merits of the case and whether the City Board provided the Charter Schools with commensurate funding in accord with the statute. As an initial matter, I note that I am not aware of any Maryland case discussing whether a determination of primary jurisdiction is an issue completely separate from the merits of the action. Thus, I turn to federal case law, and find instructive the approach stated by the United States Court of Appeal for the Tenth Circuit.

In Crystal Clear Commc'ns, Inc. v. Sw. Bell Tel. Co., 415 F.3d 1171, 1173, 1175, 1180 (10th Cir. 2005), the Tenth Circuit considered, in relevant part, whether a district court's order staying an action pending submission of the claims to the Federal Communications Commission ("the FCC") and the Oklahoma Corporation Commission ("the OCC"), which the district court concluded had primary jurisdiction, was appealable

as a collateral order, and held that "[a] district court's determination to invoke the primary jurisdiction doctrine is not sufficiently separable from the cause of action to qualify for interlocutory review." The Tenth Circuit stated that "the issues involved in a determination of primary jurisdiction are 'inextricably bound up' with a determination of the merits[.]" Id. at 1179-80. The Tenth Circuit explained:

> The entire purpose of the primary jurisdiction doctrine is to allow agencies to render opinions on issues underlying and related to the cause of action. Moreover, in order to determine whether the doctrine of primary jurisdiction was implicated in this case, the district court was required to give preliminary consideration to plaintiffs' claims to determine the extent to which they fell under the jurisdiction of the FCC and OCC. *See Delta Traffic Serv., Inc. v. Occidental Chem. Corp.*, 846 F.2d 911, 914 (3d Cir.1988) ("Only after [the district court] had ascertained the nature of the claim and related defenses could it know whether it needed to request the expert and specialized knowledge of the [agency] as a preliminary step in the resolution of this matter." (quotation omitted)). In particular, the district court's decision whether to invoke primary jurisdiction required it to consider whether the issues of fact in the case: (1) are not within the conventional experience of judges; (2) require the exercise of administrative discretion; or (3) require uniformity and consistency in the regulation of the business entrusted to a particular agency. These issues are all highly dependent on the specific allegations in plaintiffs' complaint and required the district court to examine factual and legal issues underlying the dispute. The parties' briefs on appeal, filled with detailed factual and legal arguments regarding plaintiffs' claims, further underscore the impropriety of reviewing the district court's stay order prior to final judgment.

Id. at 1179 (brackets in original) (some citations omitted). See also Beach TV Cable Co., Inc. v. Comcast of Florida/Georgia, LLC, 808 F.3d 1284, 1286 (11th Cir. 2015) (In another case involving a stay so that the FCC could consider claims, the Eleventh Circuit stated: "We lack appellate jurisdiction to entertain this interlocutory appeal. Stay orders are generally not thought to be final orders . . . , particularly where the stay is designed to effect a referral to a federal agency. . . . Nor does the collateral order doctrine apply to save

appellate jurisdiction because the district court's stay order is bound up with the merits of the case and does not render the plaintiff's suit effectively unreviewable on appeal from a final judgment.").

Although the federal cases are distinguishable from this case, the reasoning concerning whether primary jurisdiction is a separate matter from the merits of the case for purposes of the collateral order doctrine is instructive and logical. As such, I would conclude that the circuit court's determination of whether the primary jurisdiction doctrine is applicable under the circumstances of this case "is not sufficiently separable from the cause of action to qualify for interlocutory review." Crystal Clear, 415 F.3d at 1180. Stated otherwise, the determination of primary jurisdiction is bound up with the merits of the case such that the stay order is not appealable under the collateral order doctrine. And, I would also determine that the stay order is not effectively unreviewable if the appeal had to await the entry of a final judgment. Once the State Board issues its decision in the case after proper request by the parties, there is absolutely no prohibition against the Charter Schools eventually obtaining review of the circuit court's decision to issue the stay order and its determination of primary jurisdiction. See Md. R. 8-131(d) ("On an appeal from a final judgment, an interlocutory order previously entered in the action is open to review by the Court unless an appeal has previously been taken from that order and decided on the merits by the Court."); see also Beach TV Cable, 808 F.3d at 1293 ("[I]f the district court had erroneously referred the matter to the administrative agency in the first place, that determination too could be reviewed by an appellate court once the administrative agency had concluded its review." (Citation omitted)).

In my view, the Charter Schools' reliance on Schrodel, 320 Md. at 210, 214, 577 A.2d at 43, 45, is misplaced, as the case is factually and legally distinguishable from this case. Schrodel involved an issue of whether a permit was required before condemnation proceedings in the trial court, which involved a purported postponement so that the county could seek the permit from the Maryland Department of the Environment. In other words, Schrodel did not involve issues of primary jurisdiction and a stay for administrative review of a legal issue. And, significantly, in Schrodel, 320 Md. at 213, 577 A.2d at 45, this Court expressly acknowledged that "a trial court's decision on a motion for a postponement, continuance, or stay is ordinarily not appealable." (Citation omitted). Moreover, importantly, in Schrodel, id. at 214, 577 A.2d at 45, the order at issue was not simply a run-of-the-mill postponement or stay order; rather, it was an order that would essentially deprive the parties of a trial if the county failed to obtain the permit. That is obviously not the case here—the stay order does not put the parties out of court or otherwise deprive them of the ability to litigate the merits of the breach of contract claim after the State Board conducts its administrative review of the statutory issue concerning commensurate funding. In other words, the stay order in this case is more like a postponement of a trial, and not a deprivation altogether of the right to proceed with a trial. In sum, I would determine that the stay order is not appealable under the collateral order doctrine.

Although I would conclude otherwise and do not endorse the Majority's holding, the Majority's language limiting the holding that the stay order is a final judgment and is appealable to "the unique circumstances of this case" is welcome. See Maj. Slip Op. at 47. The Majority states:

- 24 -

Generally, a stay order to permit a party to bring a claim before an administrative agency will only **temporarily** put a party "out of court" and will carry with it the "strong potential, bordering on certainty, that the issue at hand . . . will be back for determination by the circuit court" if either of the parties is dissatisfied with the agency's decision and seeks judicial review before the circuit court. However, under the unique circumstances of this case, the Stay Order issued by the circuit court was a final and appealable order that had the effect of putting the Charter School Operators entirely out of court with no clear procedural path they could follow to return to court within a reasonable period of time.

Maj. Slip Op. at 47 (citation omitted) (emphasis and ellipsis in original). From my perspective, as a cautionary note, the significance of the Majority's limitation cannot be overstated. The Majority essentially counsels that trial courts and the Court of Special Appeals should not interpret this opinion to mean that stay orders in general or stay orders pertaining to matters other than those involving the unique circumstances of this case are final judgments and therefore appealable. In other words, nothing in the majority opinion's holding undermines the conclusion that stay orders in general are neither final judgments nor appealable under the collateral order doctrine.

Because I would conclude that the stay order in this case is not a final judgment and is not appealable under the collateral order doctrine, I would dismiss the appeal for lack of appellate jurisdiction. And, because I would dismiss the appeal for lack of appellate jurisdiction, I would not reach the issue of whether the State Board has primary jurisdiction. However, were I to reach that issue, I agree with the Majority that the State Board has primary jurisdiction over the underlying commensurate funding issues.

Thus, for the above reasons, respectfully, I concur in part and dissent in part.

Judge Greene and Judge Hotten have authorized me to state that they join in this

opinion.